CRUM & FORSTER, INC., International Insurance Company, United States Fire Insurance Company, North River Insurance Company, and Commonwealth Lloyd's Insurance Company, Appellants,

v.

MONSANTO COMPANY, Appellee.

No. 06–92–00100–CV.

Court of Appeals of Texas, Texarkana.

Sept. 19, 1994.

Rehearing Overruled Oct. 18, 1994.

Michael G. Norris, Payne & Jones, Overland Park, KS, David E. Keltner, Haynes and Boone, L.L.P., Fort Worth, TX, Frank C. Vecella, Jackson & Walker, L.L.P., Dallas, TX, John R. Mercy, Atchley, Russell, Waldrop, Hlavinka, Texarkana, TX, for Crum & Forster, Inc.

Robert E. Garner, Garner, Stone & Lovell, Amarillo, TX, Frederick Brown, Orrick, Herrington & Sutcliffe, San Francisco, CA, for International Ins. Co.

Steven A. Schneider, Johnson & Gibbs, Eric W. Buether, McKool Smith, Dallas, TX, Sam Baxter, Jones, Jones & Curry, Inc., Marshall, TX, for Monsanto Co.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

GRANT, Justice.

### STATEMENT OF THE CASE

**Trial Results**

Crum & Forster, Inc., International Insurance Company, United States Fire Insurance Company, North River Insurance Company, and Commonwealth Lloyd's Insurance Company (the appellants), appeal from a judgment favoring Monsanto Company (Monsanto), awarding Monsanto actual and treble damages, prejudgment interest, and attor-

neys' fees in the total amount of $71,048,-070.22, as well as costs and post-judgment interest. Monsanto sued the appellant insurance companies alleging that they had wrongfully obtained and manipulated a financial interest in the *Slaughter* litigation [1] waged against their insured, Monsanto. In its brief, United States Fire aptly characterized this suit as being "litigation about litigation."

## The Parties

Monsanto contends that the appellant insurance companies are in reality paper corporations wholly owned and controlled by the Crum & Forster corporation. Monsanto further contends that the appellants took over the plaintiffs' case in the *Slaughter* litigation principally by way of a series of Mary Carter agreements [2] and, thereby, violated their legal duty and public policy in attempting to gain financially by suing its own insured.

The insurance companies take the position that they are each separate corporate entities, and thus the fact that two of these insurance companies, United States Fire and International, were insurers of Monsanto did not prevent the other companies from obtaining an interest in the plaintiffs' case against Monsanto. The companies also contend that they had a duty to protect the interests of their insured, Farm & Home, who actually entered into the Mary Carter agreements in the *Slaughter* case.

Crum & Forster, Inc. is a holding company for several insurance companies. Crum & Forster is not an insurance company and therefore cannot issue insurance policies, nor does it handle subrogation matters or place reinsurance for any of its subsidiaries. Under the Insurance Holding Company System Regulatory Act,[3] insurance companies may share common facilities, management, services, and employees, but they must also maintain separate operating identities. Crum & Forster itself owns 100% of the stock of United States Fire, International, and North River, and another wholly-owned subsidiary of Crum & Forster owns 100% of the stock of Commonwealth Lloyd's.

Monsanto purchased several liability policies from subsidiaries of Crum & Forster, including excess general liability policies from United States Fire and International and environmental impairment liability policies (EIL policies) from International. As a result of the various phases of the Brio Site litigation (discussed in the next section), Monsanto made claims on these policies, but the Crum & Forster subsidiaries rejected all of the claims.

United States Fire, North River, and Commonwealth Lloyd's insured Farm & Home, a codefendant of Monsanto in the *Slaughter* litigation, under both primary and umbrella policies.

## The Brio Site

During the 1970s, Farm & Home purchased a large tract of land in Harris County and began developing a residential subdivision. Adjoining this property was a chemical reprocessing plant known as the Brio Site that had been utilized by a large number chemical corporations, including Monsanto, since the 1950s. Farm & Home sold lots in the subdivision to various builders who built and sold homes there beginning in 1980.

Soon after the Environmental Protection Agency designated the Brio Site as a Superfund site in 1984, three groups of homeowners brought lawsuits against the builders and Farm & Home alleging fraud and deceptive trade practices in an attempt to recover

---

1. *Slaughter v. Farm & Home Sav. Ass'n,* No. 85–17210–C (151st Dist.Ct., Harris County, Tex., Feb. 28, 1990).

2. The term *Mary Carter* was derived from the case of *Booth v. Mary Carter Paint Co.,* 202 So.2d 8 (Fla.App.Ct.1967). The term is generally used to refer to an agreement between the plaintiff and some, but not all, of the defendants whereby the parties to the agreement place a limitation on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the nonagreeing defendant or defendants. BLACK'S LAW DICTIONARY 974 (6th ed. 1990). The agreements in the present case differed significantly from the usual Mary Carter agreement because the defendant not only settled its liability but sought to participate in the proceeds of the recovery against the remaining defendant.

3. TEX.INS.CODE ANN. art. 21.49–1 (Vernon 1981 & Supp.1994).

damages for property devaluation and for mental anguish caused by the loss of value in their homes. In chronological order, these suits are known as the *Powell* suit,[4] the *Jones* suit,[5] and the *Slaughter* suit. In each of these cases, the builders and Farm & Home filed third-party actions against the owners of the Brio Site and the more than forty chemical companies that had used the site. The builders also filed cross-claims against Farm & Home for its alleged failure to disclose its knowledge regarding hazardous wastes stored at the Brio Site. The builders also sued Farm & Home for property damage in the *Powell* case. The jury came back with a verdict that Farm & Home was liable to the builders for the damages, but before the damages phase of the trial could commence, the builders settled with Farm & Home.

### The Missouri Settlement

In 1986, United States Fire, North River, and Commonwealth Lloyd's brought a declaratory judgment action in a Missouri federal court against its insured, Farm & Home, concerning a dispute over the extent of the responsibility owed by the insurers to pay for Farm & Home's past and potential future liability in the Brio Site litigation. In 1987, the parties in that dispute settled their differences. Farm & Home agreed to pay its insurers $12.5 million, and the insurers agreed to indemnify Farm & Home in all phases of the Brio Site litigation. The settlement also reaffirmed the insurers' subrogation rights, although the subrogation interest was limited to the total amount that the insurers had paid or would pay on behalf of Farm & Home in the litigation. After the resolution of the Missouri lawsuit, the insurers provided Farm & Home with a defense in the Brio Site cases utilizing the same law firm which had represented the insurers in the Missouri lawsuit. As a result of the Missouri settlement, Farm & Home no longer had any direct interest in the Brio Site

litigation because the Crum & Forster subsidiaries had stepped into its place.

In the settlement with the builders in the *Powell* case, Farm & Home's insurers, acting in accordance with their subrogation rights, paid over $20 million to the builders and also agreed to indemnify them for all claims made against them in the Brio Site litigation. Thus, the Crum & Forster subsidiary insurance companies assumed all exposure for claims asserted against either the builders or Farm & Home in all pending and future Brio Site cases.

### The *Slaughter* Lawsuit

In the *Slaughter* case, which began as an intervention in the *Jones* case but was severed, Farm & Home signed three Mary Carter agreements, one for each of three groups of plaintiffs, under which the plaintiffs released their claims against Farm & Home and Farm & Home guaranteed the plaintiffs a minimum recovery of $10,320,000. Additionally, Farm & Home gained the right to negotiate settlements with the remaining defendants, provided such settlements were reasonable. Farm & Home's board of directors reviewed and, at least nominally, approved the agreements, and its insurers funded the agreements.

Under the terms of these Mary Carter agreements, any recovery from the remaining defendants would be distributed, with the first $17.2 million going to the plaintiff homeowners, thus reducing Farm & Home's guarantee amount to zero; the next $3.1 million would go to Farm & Home, i.e., its insurers, to pay for legal expenses, and any additional amounts would be split evenly between the plaintiffs and Farm & Home (its insurers).

After the signing of the Mary Carter agreements, the attorneys representing Farm & Home began working with the plaintiffs' attorneys in pursuing the plaintiffs' claims. The focus of the plaintiffs' case then switched from the liability of Farm & Home and the builders to the liability of the chemi-

---

**4.** The homeowner plaintiffs in the *Powell* case settled their claims for over $19 million. Farm & Home's insurers, United States Fire, North River, and Commonwealth Lloyd's, paid approximately $10 million, while Monsanto paid $1.75 million.

**5.** The plaintiffs in the *Jones* case settled their claims for over $17 million. Farm & Home's insurers, United States Fire, North River, and Commonwealth Lloyd's, paid over $9 million in the settlement, and Monsanto paid out $732,000 to settle cross-claims against it.

cal companies that had used the Brio Site. Appellants contend that discovery had begun to reveal that Monsanto was the company primarily responsible for the Brio Site hazards. The plaintiffs' case also began to focus more heavily on the personal injuries allegedly suffered by the homeowners, which could be more lucrative than the property damage claims. United States Fire and International refused to pay on Brio Site related claims under any of the insurance policies that they issued to Monsanto. From October 1989 to February 1990, the *Slaughter* case was tried to a jury, which returned a take-nothing verdict in favor of Monsanto.

**The Jury Verdict and Judgment in the Present Case**

Before the trial of the *Slaughter* case commenced, Monsanto brought suit in the federal district court in Dallas against the appellants in the present case, alleging the same basic causes of action. Then, during the trial of the *Slaughter* case, Monsanto agreed to a voluntary dismissal of the federal action and, in the meantime, it filed the action which is now before this Court on appeal.

Monsanto sued the appellants in Harrison County alleging a breach of the duty of good faith and fair dealing and violations of Article 21.21 of the Texas Insurance Code. Monsanto originally included Farm & Home as a defendant but later nonsuited them without receiving consideration. Monsanto contended that Crum & Forster and its subsidiaries wrongfully obtained a financial interest in and direct control of litigation waged against their insured, Monsanto, thus violating Article 21.21 and breaching the common-law duty of good faith and fair dealing.

At trial, Monsanto offered evidence to establish that Crum & Forster and its subsidiaries had gained control of the *Slaughter* plaintiffs' case in an attempt to recoup from Monsanto all of Crum & Forster's losses in past Brio Site litigation.

The jury charge consisted of several groups of questions: Questions 1 through 4 dealt with allegations of misrepresentation and improper claims handling on the part of International with respect to a policy it issued to Monsanto; Questions 5 through 7 dealt with alleged Deceptive Trade Practices–Consumer Protection Act[6] and Insurance Code violations of all five defendants; Question 8 asked whether the insurance companies pursued a joint venture; Question 9 asked whether the corporate identities of the defendants should be disregarded; and Questions 10 through 14 dealt with an alleged breach of the duty of good faith and fair dealing.

The jury found in favor of Monsanto on all issues of liability except in answering Question 5(b),[7] and the trial court entered judgment based on the jury's answers to Questions 5 through 9, i.e., the violations of Article 21.21. The final judgment awarded Monsanto actual and treble damages, prejudgment interest, and attorneys' fees in the total amount of $71,048,070.22, as well as costs and post-judgment interest.

**ISSUES ON APPEAL**

Appellants contend that the judgment of the trial court is in error because (1) Article 21.21 of the Texas Insurance Code does not create a private cause of action through its incorporation of Section 17.46(a) of the DTPA; (2) Monsanto lacked standing to sue; (3) no actionable claim exists for the conduct alleged in jury Questions 5(a) and 5(c); (4) the evidence is legally and factually insufficient to support the finding of liability, of knowing and deceptive conduct, and of the amount of actual damages; (5) the trial court erred in failing to instruct the jury on mitigation; (6) the trial court made numerous evidentiary errors, including admitting legal

---

6. Tex.Bus. & Com.Code Ann. §§ 17.41–17.63 (Vernon 1987 & Supp.1994).

7. Question 5(b) asked the jury:
 QUESTION 5: Do you find that Defendants United States Fire Insurance Company, Commonwealth Lloyds Insurance Company and North River Insurance Company engaged in any of the following conduct in connection with the *Slaughter* litigation and that such conduct was a deceptive act or practice in the business of insurance:

 . . . .

 (b) Using confidential information provided by Monsanto against Monsanto in the prosecution of the *Slaughter* homeowners' claims.

conclusions, admitting evidence that Monsanto would place punitive damages in an environmental trust fund, limiting redirect examination, and excluding evidence of motive, good faith, and Monsanto's motion for partial summary judgment in the *Slaughter* case; (7) the appellants were deprived of a fair trial because of the trial court's inconsistent evidentiary rulings; (8) the penalty damages violate the due process guarantees of the United States and Texas Constitutions; (9) jury Questions (and Instructions) 8 on joint venture and 9 on piercing the corporate veils incorrectly stated the law; (10) the trial court erred in letting Monsanto amend its pleadings to include joint venture; (11) the evidence is legally and factually insufficient to support the submission of either Question 8 or Question 9; (12) the court took the jury's answers to Questions 8 and 9 out of context in forming the judgment; (13) the jury's answers to Questions 8 and 9 were so vague as to be meaningless and therefore could not be a basis for a judgment against International; (14) the judgment holds International vicariously liable for punitive damages in violation of Texas and federal law; (15) the jury's responses to Questions 8 and 9 are in irreconcilable conflict; (16) the trial court erred in treating Commonwealth Lloyd's as a corporation; (17) the court improperly limited International's closing argument; (18) the trial court improperly awarded attorneys' fees; and (19) the trial court incorrectly awarded, calculated, and trebled prejudgment interest.

Although three separate initial briefs have been filed on behalf of the appellants, each of these briefs adopts the points of error and arguments made in the other two. We shall, therefore, discuss all of the points of error as they apply to all of the appellants.

## LIABILITY

### Reaching Unlisted Section 17.46 DTPA Practices Through Article 21.21 of the Insurance Code

■ Monsanto is not a consumer under the DTPA guidelines, and therefore it did not plead directly for relief under Section 17.50 of the DTPA. It instead sought to reach Section 17.46 of the DTPA through Article 21.21, Section 16(a) of the Insurance Code:

Any person who has sustained actual damages as a result of another's engaging in an act or practice declared in Section 4 of this Article or in rules or regulations lawfully adopted by the Board under this Article to be unfair methods of competition or unfair or deceptive acts or practices in the business of insurance or in any practice defined by Section 17.46 of the Business & Commerce Code, as amended, as an unlawful deceptive trade or practice may maintain an action against the person or persons engaging in such acts or practices.

TEX.INS.CODE ANN. art. 21.21 (Vernon Supp. 1994).

In *Vail v. Texas Farm Bureau Mutual Insurance Co.*, 754 S.W.2d 129 (Tex.1988), the Texas Supreme Court held that Vail could reach Article 21.21, Section 16 of the Insurance Code through Section 17.50(a)(4) of the DTPA.[8] The Supreme Court also declared in *Vail* that Section 16 of Article 21.21 of the Insurance Code incorporates any *unlisted* practice that is determined to be false, misleading, or deceptive, which includes any listed or unlisted violation of Section 17.46 of the DTPA.

In other words, in *Vail,* the plaintiff went from Section 17.50(a)(4) of the DTPA to Article 21.21, Section 16 of the Insurance Code and then back to Section 17.46(a) of the

**8.** The Supreme Court said in *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129, 136 (Tex. 1988):

We hold that the Vails stated and proved a cause of action for unfair claims settlement practices *under section 17.50(a)(4) of the DTPA* on any one of three alternative grounds: (1) *by incorporating* article 21.21, § 16 of the Insurance Code, section 4(a) of Board Order 18663, and the definition of an unfair claims settlement practice in article 21.21–2, § 2(d) of the

Insurance Code; (2) *by incorporating* article 21.21, § 16 of the Insurance Code, section 4(b) of Board Order 18663, and the determinations made by this court in *Arnold v. National County Mutual Ins. Co.*, 725 S.W.2d 165 (Tex.1987) and *Aranda v. Insurance Co. of America*, 748 S.W.2d 210 (Tex.1988); and (3) *by incorporating* article 21.21, § 16 of the Insurance Code and section 17.46 of the DTPA.
(Emphasis added.)

DTPA. In the present case, Monsanto is attempting to go directly from Article 21.21, Section 16 to Section 17.46(a).

In the case of *Allstate Insurance Co. v. Watson,* 876 S.W.2d 145 (Tex.1994),[9] the Supreme Court stated that Article 21.21, Section 16 provides a private cause of action only for any practice *specifically defined* by Section 17.46 of the DTPA as an unlawful, deceptive trade practice. The Supreme Court then observed that unfair claims settlement practices are not among the listed items defined by Section 17.46 as unlawful deceptive trade practices. The Supreme Court then asserted that

> While section 17.46 may *not* be a complete list of unlawful deceptive trade practices for purposes of asserting claims under the DTPA, art. 21.21 expressly makes actionable those acts or practices that, in fact, *are defined* in section 17.46 as unlawful deceptive trade practices.

*Id.* at 149 (emphasis added).

The court in *Watson* then added that *Vail* remains the law as to claims for alleged unfair settlement practices brought by insureds against their insurers. This language must be read in light of the fact that the *Watson* case does not involve an insurer-insured relationship but is a case in which the court held that a third-party claimant does not have a direct cause of action against an insurer for unfair claims settlement practices under Section 16 of Article 21.21. *Watson* is a case in which the plaintiff sought to bring an action directly under the Insurance Code and also to reach the unfair claims settlement practice through the DTPA. *Vail* was not an action seeking to reach the DTPA through the Insurance Code but was an action seeking to reach the Insurance Code through the language of the DTPA:

> [T]he use or employment by any person of an act or practice in violation of Article 21.21, Texas Insurance Code, as amended, or rules or regulations issued by the State Board of Insurance under Article 21.21, Texas Insurance Code, as amended.

TEX.BUS. & COM.CODE.ANN. § 17.50(a)(4) (Vernon 1987).

The language referring to *Vail* [10] suggests that the holding in *Watson* is limited to third-party claimants and would not apply to the "special relationship between an insured and the insurer." The court in *Watson* goes on to say that nothing in *Vail* suggests that the extra-contractual obligation, rights, and remedies of Article 21.21, Section 16 extend to third-party claimants. Based upon the references to *Vail, Watson* must be viewed as a case determining that an uninsured has no standing for relief under the Insurance Code.

The case of *Spencer v. Eagle Star Insurance Co. of America,* 876 S.W.2d 154 (Tex. 1994), did involve an insurer-insured relationship. Spencer, the insured, had recovered from Eagle Star for the company's "unfair practice in the business of insurance," which was defined for the jury as "any act or series of acts which is arbitrary, without justification, or takes advantage of a person to the extent that an unjust or inequitable result is

---

**9.** The *Watson* case has not gone without mention in current legal periodicals:

> As it stands, the *Watson* decision is simply a twisted, mistaken interpretation of article 21.21, section 16(a), which by its plain language provides a private cause for "any person," including a third party claimant. The supreme court's existing precedent on the issue of unfair claim settlement actions against insurers, *Vail* and *Watson,* are in hopeless contradiction, yet the latter purports to follow the former. These two cases are so conflicting, and *Watson* is so illogically analyzed, that they present little guidance for the Texas courts in the future.

> Patricia D. Pope, Note, 25 TEX.TECH.L.REV. 985 (1994).

> Whatever the reasoning behind the decision, it is wrong insofar as it purports to rest upon statutory construction and insofar as it fails to properly consider public policy interests sought to be advanced by the Legislature.

Charles Bleil & Susan Bleil, *Sorry, Ms. Watson,* 28 TRIAL LAWYERS FORUM 5 (1994).

**10.** In reaching our decision today, we are particularly mindful of the duties imposed on insurers as to their insureds. *See Vail,* 754 S.W.2d at 136; *Arnold,* 725 S.W.2d at 167. *Vail* is predicated upon this Court's expressed belief that a special relationship exists between an insured and the insurer. *See Arnold,* 725 S.W.2d at 167. *Vail* remains the law as to claims for alleged unfair claim settlement practices brought by insureds against their insurers.

*Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 149 (Tex.1994).

obtained." In *Spencer,* the Texas Supreme Court found that Article 21.21, Section 16(a) by its express terms did not refer to every such practice imaginable but only to those specified by certain other statutes and regulations and that Article 21.21, Section 4 declares certain listed acts to be unfair methods of competition and unfair and deceptive acts or practices in the business of insurance. The Supreme Court in *Spencer* seems to negate any deceptive practices that are not specified by other statutes or regulations, but then the Court sends the case back for a new trial because the trial court tried to follow the statute. The Court said that the issue addressed was whether error in the instruction accompanying a jury question on liability for "unfair practice in the business of insurance" made the question immaterial or merely defective.

According to the court of appeals' opinion in *Spencer v. Eagle Star Ins. Co.,* 780 S.W.2d 837 (Tex.App.–Austin 1989), *rev'd,* 876 S.W.2d 154 the Spencers took the position that they had established liability under three causes of action recognized in *Vail:* (1) unfair settlement practices under Article 21.21–2; (2) breach of the duty of good faith and fair dealing as an unlisted unfair practice under Board Order 41060 (formerly Board Order 18663); and (3) failure to settle an unlisted deceptive trade practice. All three of these legal theories were disallowed in *Watson.* If these theories are not available to an insured, then why did the Supreme Court remand the *Spencer* case for a new trial? If none of these theories are actionable, there would be nothing left to try.

The dicta in both *Watson* and *Spencer* indicates that the Texas Supreme Court does not interpret the statutes to allow an unlisted provision of the DTPA to be reached through Article 21.21 of the Insurance Code. The holding in *Spencer* is confusing because the case is remanded for a new trial on some unknown theory. This is also dicta in *Watson,* which becomes enigmatic when the dicta is interspersed among references applauding *Vail* as being in all things proper. We shall follow the *ratio decidendi* of *Vail* until the Texas Supreme Court tells us that it is not to be followed in a case involving an insured. If

we are wrong, the Texas Supreme Court has never hesitated to so state. (Case cites are too numerous to mention and are therefore omitted.) These points of error are overruled.

### The Claims Under Jury Questions 5(a) and 5(c)

■ The appellants contend that no actionable claims exist for the conduct alleged in jury Questions 5(a) and 5(c). The jury found "yes" to the following:

QUESTION 5: Do you find that Defendants United States Fire Insurance Company, Commonwealth Lloyds Insurance Company, and North River Insurance Company engaged in any of the following conduct in connection with the *Slaughter* litigation and that such conduct was a deceptive act or practice in the business of insurance:

(a) Attempting to recover money for Defendants from Monsanto by acquiring a financial interest in, and directing the prosecution of, claims that were being asserted against Monsanto by persons who were not policyholders of Defendants.

. . . .

(c) Directing the prosecution of the *Slaughter* case in an attempt to adversely affect or defeat Monsanto's requests for reimbursement under the EIL insurance policy.

Article 21.21, Section 16 of the Insurance Code permits recovery by any person who has been injured by another's engaging in (1) any of the practices declared to be unfair or deceptive by Section 4 of Article 21.21; (2) conduct defined in rules or regulations lawfully adopted by the Board of Insurance under Article 21.21 as unfair methods of competition and unfair or deceptive acts or practices in the business of insurance; or (3) any practice defined by Section 17.46 of the DTPA, as amended, as an unlawful deceptive trade practice.

As discussed earlier, the practice involved in the present case is not specifically defined by Section 17.46 of the Business and Commerce Code as an unlawful deceptive trade practice. Neither is this practice declared to

be unfair or deceptive by Section 4 of Article 21.21 of the Insurance Code. If, however, the unlisted practices of the DTPA may be reached, then the conduct qualifies.

The Texas Department of Insurance promulgated a rule that

[i]rrespective of the fact that the improper trade practice is not defined in any other section of these rules and regulations, no person shall engage in this state in any trade practice which is determined pursuant by law to be an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.

28 TEX.ADMIN.CODE § 21.3(b) (West 1992) (Tex.Dept. of Ins., Unfair Trade Practices Prohibited).

The practice involved in the present case has not been determined pursuant to statute to be an unfair method of competition or a deceptive act or practice in the business of insurance, but the practice covered by jury Question 5(a) has been found to be against public policy and as such could be considered an unfair act or practice in the business of insurance. In the case of *Beech Aircraft Corp. v. Jinkins*, the Supreme Court of Texas clearly set forth the rule that defendants who settle a tort plaintiff's entire claim could not preserve a right to contribution from other alleged tortfeasors who did not participate in the settlement. *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19 (Tex.1987); *see also International Proteins Corp. v. Ralston–Purina Co.*, 744 S.W.2d 932 (Tex.1988).

■ The doctrine that a settling joint tortfeasor may not preserve contribution rights or take assignment of a plaintiff's cause of action to seek reimbursement from nonsettling tortfeasors applies in the business of insurance—and specifically to liability insurance carriers. *Insurance Co. of North America v. Security Ins. Co.*, 790 S.W.2d 407 (Tex.App.–Houston [1st Dist.] 1990, no writ) (applies to "a settling tortfeasor and those in privity with it"). The appellants correctly contend that they were not all involved in all the agreements in question and that no assignment of the plaintiffs' causes of action was made to each of them. The *Slaughter* plaintiffs did retain half of the cause of action so that the three companies involved would not get the entire recovery made on behalf of the plaintiffs. While it is true that this suit was pursued under the name of Farm & Home, in accordance with the Missouri settlement agreement, the three insurance companies would receive any recovery in lieu of Farm & Home. This arrangement violates the principle set forth in the *International Proteins Corp.* and *Beech Aircraft Corp.* cases. As the court said in the *Beech Aircraft* case, "the settling defendant's unusual posture as surrogate plaintiff, co-defendant and cross-plaintiff will confuse the jury and possibly prejudice the remaining parties." In the present case, the problem is compounded because the jury is never allowed to know that the appellants are in effect seeking a recovery in the case.

In the above cases, the violation of public policy was used as a defense in the action in which the settling joint tortfeasor pursued the plaintiff's cause of action. We find that these cases nevertheless fulfill the requirement of establishing an unfair act in the business of insurance. Thus, if Monsanto was an insured party, it had a cause of action for the conduct set forth in jury Question 5(a).

■ If Monsanto was an insured party, it was owed a duty of good faith and fair dealing.[11] Because recovery under the find-

---

11. The Texas Supreme Court decision in *Arnold v. National County Mutual Fire Insurance Co.*, 725 S.W.2d 165 (Tex.1987), placed Texas with the majority of states in permitting an insured to institute a common-law action against the insurer for a breach of the duty of good faith and fair dealing. Although the *Arnold* decision dealt with uninsured motorists protection under his automobile insurance policy, the scope of the common-law cause of action for breach of a duty of good faith and fair dealing covers all types of insurance contracts. The Supreme Court recognized that the insurance context creates a special relationship between the parties and imposes a duty on insurance companies. This duty applies to the insured's liability carrier as well as other types of insurance. The duty of good faith and fair dealing had its origin in the New York Court of Appeals decision of *Brassil v. Maryland Casualty Co.*, 210 N.Y. 235, 104 N.E. 622 (Ct.App. 1914), which involved a liability policy. Texas began recognizing this duty under the terms of negligence as far back as the *Stowers* case. *G.A. Stowers Furniture Co. v. American Indem. Co.*, 15

ing of good faith and fair dealing was not briefed by the parties as an alternative theory found by the jury, we do not address that recovery in this opinion.[12] But it is necessary for us to determine if a duty was owed to Monsanto as an insured in order to determine if there has been a deceptive trade practice. If the appellant insurers owed a duty to Monsanto, an attempt by them to avoid policy coverage by directing and manipulating the prosecution in the *Slaughter* case would constitute a deceptive trade practice while involved in the business of insurance. The Texas Supreme Court held in *Vail* that failure of an insurance company to exercise good faith suffices as a requisite determination of an unlisted deceptive trade practice.

■ The appellants additionally contend that the conduct inquired into in Questions 5(a) and 5(c) does not constitute "trade or commerce" under DTPA Section 17.45(6), and thus the alleged conduct cannot violate that section. They point out that DTPA Section 17.45(6) defines the phrase "trade or commerce" as "the advertising, offering for sale, sale, lease, or distribution of any good or service ... and any other article, commodity, or thing of value." The appellants assert that post-sale conduct of an insurer does not constitute actionable conduct under Section 17.46, citing *Rosell v. Farmers Texas County Mut. Ins. Co.*, 642 S.W.2d 278 (Tex. App.—Texarkana 1982, no writ) (post-sale conduct of insurer held not actionable under DTPA). We disagree. The fact that the defendant's misrepresentations, breaches, or unconscionable acts occur after the sale of the goods or services will not prevent the plaintiff from being a consumer for purposes of the DTPA. *Flenniken v. Longview Bank and Trust Co.*, 661 S.W.2d 705 (Tex.1983);

*Hines v. Evergreen Cemetery Assoc.*, 865 S.W.2d 266 (Tex.App.—Texarkana 1993, no writ).

Monsanto's cause of action in the present suit is based on the incorporation of DTPA Section 17.46 in Article 21.21, Section 16 of the Insurance Code. In *Vail*, 754 S.W.2d at 135–36, the Texas Supreme Court held that the Vails stated and proved a cause of action for unfair claims settlement practices on three alternative grounds, one of which was through Article 21.21, Section 16 incorporating DTPA Section 17.46. *See also Aetna Cas. and Sur. Co. v. Marshall*, 724 S.W.2d 770 (Tex.1987) (holding that a cause of action existed for workers' compensation insurer's failure to comply with settlement agreement under Article 21.21 and Section 17.46 even though plaintiff was not a consumer under the DTPA). In the next section, we examine whether there was an insurer-insured relationship, and if so, if a duty arose as a result of that relationship, and whether there was evidence showing that such a duty was violated.

**An Insured Party?**

■ To recover under the Insurance Code, Monsanto must show that there was a duty created by an insured-insurer relationship.[13] *Allstate Ins. Co. v. Watson*, 876 S.W.2d 145 (Tex.1994). The mere fact that there was some type of insurance coverage does not create a duty if the insurance coverage is totally unrelated to the occurrence in question. There must be a connection between the policy coverage and the occurrence in question. *CNA Ins. Co. v. Scheffey*, 828 S.W.2d 785 (Tex.App.—Texarkana 1992, writ denied); *Chaffin v. Transamerican Ins. Co.*, 731 S.W.2d 728 (Tex.App.—Houston [14th

---

S.W.2d 544 (Tex.Comm'n App.1928, holding approved); *see* Rayne Rasty, Comment, *Extending Good Faith and Fair Dealing to Employment Contracts: A Proposal*, 22 Tex.Tech.L.Rev. 211, 227 (1989).

**12.** The jury returned favorable findings for Monsanto on alternative theories, and Monsanto moved for alternative judgments based upon the alternative findings. Therefore, Monsanto did not waive its right to recover under the alternative theory of the duty of good faith and fair dealing. *Boyce Iron Works v. Southwestern Bell*

*Telephone Co.*, 747 S.W.2d 785 (Tex.1988); *see also Oak Park Townhouses v. Brazosport Bank of Texas*, 851 S.W.2d 189 (Tex.1993).

**13.** Monsanto suggests that the appellants waived the proof of insurance by failing to urge this as an objection to the special issues, citing *Hernandez v. Montgomery Ward & Co.*, 652 S.W.2d 923 (Tex.1983). This, however, is not a defect in the jury issues that were presented, but is a required element that Monsanto had a duty to prove in this litigation.

Dist.] 1987, writ ref'd n.r.e.). Monsanto cites *Viles v. Security National Insurance Co.*, 788 S.W.2d 566 (Tex.1990), for the proposition that policy coverage is not required. In *Viles*, the homeowner's action for bad faith was not barred by the failure to timely file a proof of loss form as required by the policy. It was, nevertheless, the existence of the policy that established the "special relationship" between the insured and the insurer imposing a duty on the insurer.

Monsanto had environmental impairment liability (EIL) policies with International Insurance Company.[14] These policies covered liability for emission, discharge, dispersal, disposal, seepage, release, or escape of any irritant, contaminant, or pollutant. They covered personal injuries, property damage, and damage caused by environmental impairment in connection with the insured's business. The policy further indemnified for related cleanup and litigation costs. The policies covered $20 million per claim with $40 million aggregate, and also contained a $1 million deductible per claim per provision. The insurer was entitled to take over and conduct the defense of any claim but was not required to do so under the terms of the policy.

Monsanto also had excess liability insurance policies with International. These policies indemnified Monsanto for losses and expenses exceeding the amounts covered by underlying insurance. One of the policies excluded pollution-related liability. The others did not contain that exclusion. The policy in evidence as Exhibit 3423 covered amounts of liability over $68 million but was limited to $3 million per occurrence and $12 million annual aggregate. The policy in evidence as Exhibit 3426 covered amounts over $80.5 million and was limited to paying up to $7 million per occurrence and $20 million annual aggregate. The policy in evidence as Exhibit 3429 covered amounts over $80 million and paid up to $5 million per occurrence and up to $20 million annual aggregate. The company has no duty to defend under the policies but could cooperate in a defense. The policies provide for the insurer to indemnify the insured for legal expenses, but in the policy marked Exhibit 3429, this is modified to a proportionate share of the expenses.

United States Fire Insurance Company issued an excess liability policy to Monsanto covering the net loss in excess of the amount covered by underlying insurance for damages arising out of hazards covered by the underlying insurance. This policy excludes coverage for damages from contamination or pollution that did not occur suddenly or accidentally. The policies covered amounts over $56 million, paying up to $5 million per occurrence and $22 million annual aggregate. The policy contains no duty to defend on the part of United States Fire.

 The Texas courts follow the allegations-of-complainant rule in determining a duty to defend under liability policies. *Feed Store, Inc. v. Reliance Ins. Co.*, 774 S.W.2d 73 (Tex.App.—Houston [14th Dist.] 1989, writ denied). The Texas Supreme Court has held that the duty to defend is determined solely from the face of the pleadings and without reference to facts outside the pleadings. *Heyden Newport Chem. Corp. v. Southern Gen. Ins. Co.*, 387 S.W.2d 22, 24–25

---

**14.** The Delaware Superior Court, hearing Monsanto's insurance coverage claims, granted a partial summary judgment favoring International on April 15, 1994. The court held that the EIL policy did not cover Monsanto's Brio Site liabilities because policy exclusion 7(a) excludes environmental impairment arising from "any commodity, article or thing supplied, repaired, altered or treated by the Insured and happening elsewhere than at the Insured's premises after the Insured has ceased to own and exercise physical control over that commodity, article or thing supplied, repaired, altered or treated." The court found that Monsanto produced materials sent to the Brio Site, that Monsanto did not own the Brio Site, and that Monsanto had ceased to exercise control over the materials, and, therefore, exclusion 7(a) excluded coverage under the EIL policy.

Monsanto has filed an interlocutory appeal to the Delaware Supreme Court challenging the partial summary judgment on the basis that the Superior Court erred in refusing to admit extrinsic evidence offered by Monsanto to demonstrate that International represented that exclusion 7(a) did not apply to waste material. The Superior Court had excluded the parol evidence on the basis that the policy was unambiguous. The jury in the present case specifically found in jury Question 5(a) that International engaged in an unfair or deceptive act related to the terms of the insurance.

(Tex.1965). Although, as we have stated, there was no duty to defend under the liability policies involved in this case, this rule is appropriate for determining if other duties of the insurer are triggered by the litigation filed against the insured. The allegations-of-complainant rule means that, by looking at the pleadings against the insured, a determination can be made whether these allegations cover an area for which the insured has coverage. The insured does not have to wait until there is a judgment against it to determine whether a duty is owed by the insurance carrier. (Indeed in the present case, the underlying trial found no damages against Monsanto.)

In the underlying suit, there were numerous plaintiffs who sought to recover $500,000 per plaintiff couple and $400,000 per single plaintiff, plus $375 million in the aggregate for punitive damages. There is no question that under the terms of these policies, the excess amounts could be reached or the deductible could be satisfied. The nature of the damages alleged was from dumped or spilled hazardous chemicals. There was potential liability coverage for International and United States Fire in the *Slaughter* lawsuit, and thus, a duty was owed to Monsanto based upon the insurer-insured relationship.

In an article entitled *Insurance Law* (R. Brent Cooper & Michael W. Huddleston, *Insurance Law*, 44 Sw.L.J. 329, 354–55 (1990)), it is suggested that, when an excess carrier has no duty to defend, there can be no duty of good faith and fair dealing that would support a tort action against the excess carrier, citing *Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276 (5th Cir.1989). In the *Harville* case, the court found that the only allegation of a lack of good faith and fair dealing was the failure to defend, and under the terms of the policy, the excess insurance carrier had no duty to defend. This case does not stand for the proposition that there are not other duties owed by an excess carrier without a duty to defend, and among these duties is the duty to refrain from activities inconsistent with its relationship with the insured. When a party makes a claim under its own liability policy, that claim is not for the payment of funds but, pursuant to 28

TEX.ADMIN.CODE § 21.201 (West 1988) (Tex. Dept. of Ins., Unfair Claims Settlement Practices Rules), that term also includes the providing of services under the terms of a policy. *See* R. Brent Cooper & Michael W. Huddleston, *Insurance Law*, 46 SMU L.REV. 1541, 1543–44 (1993). These services might include a defense in the suit if the policy so provided. It would certainly include the duty of good faith and fair dealing as an insurer under the policy and a duty to refrain from practices that would be against public policy by the insurance carrier.

We find that International and United States Fire owed a duty to Monsanto as insurers. This gave Monsanto standing as an insured under the Insurance Code. To what extent this duty applied to the other appellants will be discussed under "Joint Ventures and Disregarding the Corporate Identities."

## SUFFICIENCY OF THE EVIDENCE

### Standard of Review

The appellants contend that the evidence is legally and factually insufficient to support the jury's answers.

In reviewing a legal sufficiency point of error, the court should examine only the evidence and inferences that support the jury's finding and it should disregard all evidence and inferences to the contrary. *Larson v. Cook Consultants, Inc.*, 690 S.W.2d 567 (Tex.1985). If there is any evidence of probative value which supports the finding then the point of error fails. *Holley v. Watts*, 629 S.W.2d 694 (Tex.1982).

When reviewing a factual sufficiency point of error, the court should examine all of the evidence and set aside the finding only if it goes against the overwhelming weight of the evidence so as to be clearly wrong and manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

### Sufficiency of the Evidence to Support Jury Finding 5(a)

The appellants assert that there is no evidence to establish that the three defen-

dants named in Question 5(a) acquired a financial interest in the *Slaughter* plaintiffs' claims against Monsanto; in fact, the insurers of Farm & Home were not even parties to the *Slaughter* Mary Carter agreements. Through the Missouri settlement agreement the insurers became, in effect, substituted for Farm & Home as the real parties in interest in the Brio Site cases. *See Stafford Metal Works, Inc. v. Cook Paint & Varnish Co.,* 418 F.Supp. 56, 58 (N.D.Tex.1976). The insurers negotiated the *Slaughter* Mary Carter agreements, expressly providing for Farm & Home to have a stake in the recovery of the *Slaughter* plaintiffs. Thus, the insurers gained a direct financial interest in the *Slaughter* plaintiffs' claims because of their subrogation rights.[15]

The *Slaughter* settlement agreements provided that the homeowners release all of their claims against Farm & Home and the builders. The Question 5 defendants, through their insured Farm & Home, guaranteed to pay the homeowners $10,320,000. The insurance companies, through Farm & Home, received the right to share in the homeowners' recovery from the other defendants, which was ultimately narrowed down to one defendant: Monsanto. The recovery was to be divided upon the following formula: the landowners were to receive the first $17.2 million, thus reducing the guarantee amount to zero. The next $3.1 million would be paid to the insurance companies to reimburse them for legal fees spent in continuing the *Slaughter* litigation against Monsanto. The insurance companies and the homeowners were to evenly split any money received over $20.3 million. Crum & Forster, through Farm & Home, acquired the sole authority to settle the claims of the *Slaughter* plaintiffs and, in essence, received the right to control the prosecution for the *Slaughter* plaintiffs.

The appellants take the position that the *Slaughter* plaintiffs' claims were neither purchased nor assigned, but in the next sentence of their brief they admit that "these three

insurers [United States Fire, North River, and Commonwealth Lloyd's] might have ultimately benefited from a recovery in *Slaughter.*" This, the appellants contend, is not evidence that these three insurance companies acquired a financial interest in the *Slaughter* plaintiffs' claims. Semantic quibbling aside, the bottom line was that the three insurance companies could profit if the plaintiffs obtained a large judgment against Monsanto.

The appellants contend that an insurance company has a right and a duty to pursue and defend claims on behalf of its insured, Farm & Home. The appellants, however, have cited no cases in which the insurer of a defendant in a case had the duty to take the role of a plaintiff who was not its insured to proceed against another defendant.

The appellants additionally contend that the jury had no basis on which to find that the *Slaughter* claims were asserted by persons who were not policyholders of the defendants. The appellants raised the defensive theory below that their actions in the *Slaughter* litigation was for the purpose of protecting their insured Farm & Home, but we find no place where they have raised a defensive theory that they were also protecting the plaintiffs in that litigation as their insureds. They cannot now argue for the first time on appeal that there was some duty owed to the plaintiffs because of some unmentioned insurance policy coverage. *See Perry v. Brooks,* 808 S.W.2d 227 (Tex.App.—Houston [14th Dist.] 1991, no writ). Furthermore, the appellants have not explained what duty of protection they owed to the plaintiffs as insureds that required them to reap a benefit from the plaintiffs' recovery and to take control of the *Slaughter* litigation.

### Sufficiency of the Evidence Regarding Control of the Litigation

▆ The appellants next attack the sufficiency of the evidence to establish that the three defendants named in jury Question 5,

---

15. A letter marked "highly confidential" from Crum & Forster (the stationery also carries the names of the North River Insurance Company, Westchester Fire Insurance Company, International Insurance Company, and United States Fire Insurance Company) expressly states, "All consideration is being paid in benefit of Farm & Home by Crum & Forster commercial insurance, and only Crum & Forster commercial insurance is entitled to share in potential Mary Carter recoveries with the homeowner plaintiffs."

United States Fire, North River, and Commonwealth Lloyd's, directed the prosecution of the *Slaughter* plaintiffs' claims against Monsanto and that the attorneys were in actuality agents of the defendants. The appellants suggest that it was Farm & Home's attorneys and the attorneys representing the *Slaughter* plaintiffs who actually conducted the litigation.

In the Missouri lawsuit between Farm & Home and its insurers, the defendants named in Question 5 were represented by the Niewald–Waldeck law firm. Under the Missouri settlement agreement, the Question 5 defendants had the authority to hire a law firm to handle Farm & Home's part in the Brio Site litigation, including the negotiation and drafting of the *Slaughter* Mary Carter agreements. Through Farm & Home's participation in the Mary Carter agreements, the insurance companies gained the authority to hire counsel to control the plaintiffs' case, and the Niewald–Waldeck firm was hired for that purpose. For its representation of Farm & Home's interests, Crum & Forster, the parent corporation of the insurance companies, paid Niewald–Waldeck several million dollars before and after the Mary Carter agreements were signed. Furthermore, Mike Waldeck, a name partner in the firm, testified that Brad Rich, a vice-president of each of the appellants, depended on him to handle and manage the Brio Site litigation. The hiring of attorneys to conduct litigation is a general practice by officers of the corporation. *See Bankers' Trust Co. v. Cooper, Merrill & Lumpkin,* 179 S.W. 541 (Tex.Civ. App.—Amarillo 1915, no writ). The evidence shows that Rich made the policy decisions concerning the direction of the litigation, and the attorneys carried out the decisions made by Rich. The Question 5 defendants allowed Rich to supervise the litigation in such a way that, if actual authority did not exist, there was apparent authority. Furthermore, the evidence shows that the Question 5 defendants were willing to accept the benefits of such representation (see footnote 15) and met the obligations under both the Missouri settlement agreement and the Mary Carter agreements.

Lynn Ewing, Farm & Home's corporate secretary and general counsel, testified that Farm & Home had no choice in accepting Niewald–Waldeck's representation and had no involvement in directing the firm's efforts ostensibly undertaken on its behalf. He said that he thought Brad Rich was directing the litigation. He also suggested that after Farm & Home signed the Missouri agreement, it was out of the litigation and Crum & Forster had the right to control Farm & Home's position on the matter in all respects.

As to Farm & Home's entering into the Mary Carter agreements, Ewing testified that Farm & Home had no involvement in drafting or negotiating the agreements, and Farm & Home was obligated to accept the agreements based on the terms of the Missouri agreement. He further testified that no one at Farm & Home was ever asked for any input or to approve of the Mary Carter agreements. Waldeck testified that Rich participated in the plan to pursue the Mary Carter agreements, and Rich testified that he was involved in the agreement negotiations and approved the agreements before they were signed.

The Mary Carter agreements gave Farm & Home, whose case was being handled by Niewald–Waldeck under the direction of Rich, the sole authority to settle with what they called the "waste-generators," including Monsanto. Robert Marett, the *Slaughter* plaintiffs' original attorney, stated that he understood from Waldeck that the Mary Carter agreements had been entered into because Rich felt it was time to "get off the fence" and take the posture that people were injured in the Southbend subdivision by the Brio Site hazard.

Marett further testified that he disagreed with lawyers from Niewald–Waldeck on whether to take the position that Farm & Home did nothing wrong in Southbend and that it was all Monsanto's fault, but the Niewald–Waldeck firm continued those positions. Marett also stated that after the Mary Carter agreements were signed, Niewald–Waldeck prepared all of the amended petitions, took all the depositions, selected and retained all of the expert witnesses, and conducted all of the direct and cross-exami-

nations. Based on all the foregoing, we find that the evidence is sufficient to support the conclusion that agents of the defendants named in Question 5 controlled the prosecution of the *Slaughter* plaintiffs' claims against Monsanto. Based on the jury's findings on joint venture and disregarding the corporate identities, it is clear that the jury believed the evidence that showed that all of the appellants were working in concert and that the acts of Crum & Forster also constituted the acts of the three named insurance companies in Question 5. Thus, the points of error on sufficiency of the evidence regarding the control of the litigation are overruled.

### The Omission of a Jury Question on Agency

■ The appellants argue under the sufficiency points of error that the trial court erred in not submitting a separate jury question inquiring whether an agency relationship existed between the defendants named in Question 5 and the attorneys who actually conducted the plaintiffs' case in the *Slaughter* litigation. But the appellants have waived any error on this issue by failing to raise it in an appropriate point of error on appeal. *See* TEX.R.APP.P. 74; *Perry v. Brooks*, 808 S.W.2d 227. We do point out that the trial court instructed the jury on agency in both the general instructions to the charge and again in the instructions following Question 5,[16] but the appellants objected to the court's failure to give the jury a question specifically asking whether an agency relationship existed between the defendants listed in Question 5 and the attorneys controlling the *Slaughter* litigation.

### Sufficiency of the Evidence to Support Jury Finding 5(c)

■ The appellants also contend that there is no evidence or insufficient evidence to support the trial court's submission of or the jury's response to Question 5(c). Question 5(c) inquired into whether the appellants manipulated the *Slaughter* litigation in an attempt to defeat Monsanto's reimbursement rights under the EIL policy issued to Monsanto by International.

The appellants contend that there is no evidence to establish that it was the three defendants mentioned in Question 5(c) who pushed the statutory violation claims made by the *Slaughter* plaintiffs. They contend that the statutory violation claims were first made against Monsanto by the *Slaughter* plaintiffs nearly two years before the signing of the Mary Carter agreements. The success of Question 5(c), according to the appellants, depended entirely on inferences drawn from the existence of the Mary Carter agreements, but that such inferences are without probative value because the claims predated

16. General instruction 7 in the charge instructed the jurors as follows:

7. In answering the questions in this charge, you are instructed that a corporation acts through its agents, officers and employees. An agent for a corporation is one who has been given the authority, either actual or apparent, to act for it or on its behalf.

"Actual authority" of an agent to act on behalf of a principal may be "express" or "implied." "Express authority" is that authority delegated to an agent by words that expressly and directly authorize him to do an act. "Implied authority" is the authority to do whatever is reasonably necessary and proper to perform an act which is then expressly delegated. There cannot be implied authority without some grant of express authority.

"Apparent authority" means such authority as a reasonably prudent person, using diligence and discretion in view of the principal's conduct would naturally and reasonably suppose the agent to possess. A principal may knowingly permit the agent to hold himself out as having such authority as to lead a reasonably prudent person to believe he has actual authority. A principal may also clothe the agent with signs or indications of authority as to lead a reasonably prudent person to believe that the agent has such authority. Apparent authority can exist with actual authority.

The jury was instructed immediately after Question 5 as follows:

In addition to the instructions regarding agents of corporations given in the general instructions above, you are further instructed that any person who does any of the following acts on behalf of an insurance company is an agent for that insurance company for which the act is done:

Solicits insurance; or takes or transmits an application; or takes or transmits a policy of insurance to or from such insurance company; or receives, collects or transmits any premium of insurance; or examines or aids in or handles any claim; or performs any act in the making of an insurance contract for the insurance company.

the agreements. *See Briones v. Levine's Dep't Store, Inc.,* 446 S.W.2d 7, 10 (Tex.1969).

There is ample evidence in the record to support the jury's answer to Question 5(c). The EIL policy issued by International excludes coverage for liability resulting from "Environmental Impairment arising out of the Insured's noncompliance with any valid and applicable statute, regulation or written instruction relating to Environmental Impairment issued by competent authority."

After the defendants named in Question 5 took control of the *Slaughter* plaintiffs' case, they amended the pleadings to add a number of claims for alleged violations of various statutes and regulations by Monsanto in its waste disposal practices. The original attorney for the plaintiffs, Robert Marett, testified that he had no intention of asserting statutory violation claims against Monsanto. Monsanto contends that the jury could have easily compared the pleading prepared by Marett with the pleading prepared by Niewald–Waldeck, the firm hired by the Question 5 defendants to represent the plaintiffs in *Slaughter,* and conclude that it was the Question 5 defendants who were behind the addition of the statutory violations in the pleadings.

Prior to the takeover of the Brio Site litigation, there was one section (XXVIII) of the plaintiffs' pleadings in the *Slaughter* litigation that alleged a violation of statutory duty by the defendants in that litigation. This section alleged that the owners and operators of the Brio Site violated their statutory duty to create, operate, and maintain this waste site in a manner which was safe to the surrounding environments. They further alleged that the waste generators and waste transporters violated their statutory duty to store or dispose of hazardous chemical substances in facilities which were safe to surrounding environments (plaintiffs' seventh amended original petition).[17] After the Question 5 defendants took over the litigation, they filed plaintiffs' eighth amended original petition.[18] This pleading stressed the statutory violations, including allegations that the defendants had violated the Texas

Clean Air Act of 1965, as amended, Article 4477–5, Vernon's Annotated Civil Statutes; the Texas Water Quality Act, Article 7621d, as amended, Vernon's Annotated Civil Statutes; and Orders Number 67–5, 69–52, 70–0220–1, 70–0529–7, 70–0828–5, 71–0820–18, 75–1125–1, and 77–0303–8, of the Texas Water Quality Board implementing the Act, 25 T.A.C. §§ 325.1, *et seq.;* 31 T.A.C. § 335.4; Chapter 26 of the Texas Administrative Code; the Texas Solid Waste Disposal Act; and the Solid Waste Act of 1965. They further contended that the defendants had violated implementing orders and regulations under these Acts, including Regulations II, III, and V of the Texas Air Control Board. In this petition it was also alleged that the defendants had violated the Federal Water Pollution Control Act and its implementing regulations. The new *Slaughter* pleading clearly placed considerably more emphasis on statutory violations after the Question 5 defendants took over.

Shortly after the statutory violations were added to the plaintiffs' pleadings in *Slaughter,* the appellant companies involved in the Delaware lawsuit, in which coverage of Monsanto for its Brio Site losses was disputed, answered against Monsanto's pleadings and asserted as a defense that Monsanto violated the same statutory provisions cited by the *Slaughter* plaintiffs. We find the evidence legally and factually sufficient to support the jury's finding that the appellants attempted to manipulate the *Slaughter* litigation to defeat any reimbursement rights Monsanto might have under the EIL policy issued by International.

### Sufficiency of the Evidence to Support the Finding of Knowing Conduct

Question 7 asked the jury whether the defendants knowingly engaged in the deceptive conduct that the jury found the defendants committed in their finding in Question 5. The trial court defined knowingly, for the purposes of Question 7, as actual awareness of the deception of the conduct in question. The appellants contend that the record is without any evidence to support the

---

17. Trial Exhibit No. 934.

18. Trial Exhibit No. 968.

jury's affirmative answer to Question 7. The appellants further contend that, since no judicial, legislative, or administrative source had previously defined the conduct undertaken by the appellants in the present case as illegal or wrongful, they could not have known that the conduct could be deceptive.

The appellants were charged with knowledge under existing case law that they were violating public policy by seeking damages in the shoes of the plaintiffs against a nonsettling defendant. *See International Proteins v. Ralston–Purina Co.*, 744 S.W.2d 932, 934 (Tex.1988); *Bonniwell v. Beech Aircraft Corp.*, 663 S.W.2d 816, 819 (Tex.1984); *Beech Aircraft Corp. v. Jinkins*, 698 S.W.2d 722, 727 (Tex.App.—Houston [1st Dist.] 1985), *aff'd*, 739 S.W.2d 19, 22 (Tex.1987). They also knew that in effect, by the agreements they prepared, they were purchasing a financial interest in the *Slaughter* plaintiffs' claims when they entered into the Mary Carter agreements with the plaintiffs, and they were aware of the inherently deceptive nature of such agreements because of the numerous cases which had criticized the deceptive nature of such agreements.[19] They were also aware of the changes made in the pleadings of the *Slaughter* case after they took over the litigation and were aware of the exclusion in the policy issued by International. The liability claim manual provided by the Crum & Forster organization, under the heading "Mary Carter Agreements Disapproved," contains the following statement: "The Mary Carter Agreement is inherently inequitable and misleading to court and jury and the insurance industry should refrain from the use of such agreement." However, the manual was revised in 1990, and there is no showing that this information was in the manual at the time of the *Slaughter* litigation.

The conduct of the appellants under both jury findings was a clear-cut conflict of interest. Conflicts of interest have long been recognized in the legal community. It is possible even within a single entity to set up what is sometimes referred to as a Chinese wall to prevent the flow of information internally between the different sections or departments presenting the conflict of interest. *See InterFirst Bank Dallas, N.A. v. Risser*, 739 S.W.2d 882, 903 (Tex.App.—Texarkana 1987, no writ). There was no indication that the appellants in the present case sought to maintain such separation. The evidence suggests they acted in total concert with not so much as a two-strand barbed-wire fence between the insurer of Monsanto and the parties controlling the litigation against Monsanto.[20]

While it is true that the Texas Supreme Court decision outlawing Mary Carter agreements had no retroactive effect, such agreements had been condemned in prior opinions. Furthermore, the Mary Carter agreements involved in the *Slaughter* litigation went far beyond the usual Mary Carter agreements in that the defendants could actually profit by the recovery of the plaintiffs, not just lessen their own liability. We find the evidence to be legally and factually sufficient to support the jury's finding of knowing conduct. These points of error are overruled.

**Deceptive Conduct**

 The appellants also contend that there is no evidence, or alternatively insufficient evidence, establishing that the conduct inquired of in Question 5(a) was deceptive. The appellants say that because the alleged acts were previously disclosed they could not have fit the trial court's definition of deceptive conduct as "acts that have the tendency to deceive." The appellants further support their position with the fact that the insurance relationship between Farm & Home and the three defendants named in Question 5 was disclosed to Monsanto because Monsanto knew that the three defendants were insurers of Farm & Home and that the insurance policies contained standard subrogation provisions. Appellants further state that the Missouri settlement agreement was disclosed to Monsanto because its existence was revealed in a 1987 press release and in an

---

19. In *Elbaor v. Smith*, 845 S.W.2d 240, 247–49 (Tex.1992), the court details the criticism that had been waged against Mary Carter agreements.

20. This evidence is discussed in greater detail in the section "Joint Ventures and Disregarding the Corporate Identities."

article in the *St. Louis Dispatch,* a major newspaper in the city in which Monsanto's headquarters is located, and because the agreement was filed with the Securities and Exchange Commission, thus making it available to the public. Additionally, the appellants suggest that Monsanto received notice of the Mary Carter agreements in 1988, when Farm & Home furnished Monsanto with copies of the agreements. They maintain that Monsanto used these agreements in the *Slaughter* case by revealing their existence to the jury, thus escaping liability in the *Slaughter* trial. The Mary Carter agreements, however, do not reveal any of the appellants to have been parties to those agreements or to have had any part in the negotiation of those instruments.

Monsanto explains that it first began to piece together the real picture of the appellants' activities when it came across the Missouri settlement agreement after it was filed with the Securities and Exchange Commission. According to Monsanto, the press release that revealed the signing of the Missouri settlement agreement was not sufficient to give Monsanto notice of the appellants' financial interests and control in the *Slaughter* case, because those interests were created a year later in May 1988 with the signing of the Mary Carter agreements. The press release does not even mention the appellants by name or reveal any significant terms of the Missouri settlement agreement apart from the money paid by Farm & Home to its insurers.

In August 1989, two months prior to the commencement of trial in the present case, Monsanto filed a federal suit against the appellants alleging essentially the same causes of action as it has in the present case. The complaint in this federal suit demonstrates that Monsanto was aware of the appellants' conduct in *Slaughter* at least by August 1989.

Monsanto takes the position that the appellants' conduct in the prosecution of the *Slaughter* case was deceptive and violative of Texas law in that the appellants disguised the true facts of their role in the plaintiffs' case. In other words, Monsanto contends that, even if the relevant documents were

disclosed, the documents themselves do not reveal the appellants' financial interests in and direct control of the *Slaughter* litigation.

The Missouri settlement agreement and the Mary Carter agreements are not themselves inherently deceptive. But Monsanto contends, and the jury apparently found, that they were an integral part of a greater scheme of deception. As discussed above, the evidence supports the finding that the appellants, through Crum & Forster, controlled the litigation for Farm & Home and the plaintiffs in the *Slaughter* case. They were involved in negotiating the Mary Carter agreements, they were willing to accept any benefits derived from the litigation, and they and their agents generally supervised and controlled the litigation. The fact that Monsanto discovered the depth of the appellants' involvement before the *Slaughter* trial actually commenced does not negate the deceptive nature of the conduct.

The evidence is legally and factually sufficient to support the jury's finding that the defendants named in Question 5 engaged in deceptive conduct. These points of error are overruled.

## The Proper Measurement of Damages

Question 6 of the jury charge asked what sum of money would compensate Monsanto for the injury that resulted from the deceptive acts which the jury found in Question 5 that the defendants had committed. In the instruction accompanying Question 6, the trial court informed the jury that it could consider attorneys' fees, expenses, and related costs of litigation which Monsanto expended in defending the *Slaughter* litigation after May 18, 1988, the date on which the Mary Carter agreements were signed. The appellants contend that the trial court erred in submitting Question 6 to the jury and in forming a judgment based on the jury's answer to that question.

The appellants first contend that the trial court's submission of Question 6 was erroneous as a matter of law. Under the Insurance Code and the DTPA, actual damages means those damages available at common law. *Kish v. Van Note,* 692 S.W.2d 463, 466 (Tex. 1985); *Frank B. Hall & Co. v. Beach, Inc.,*

733 S.W.2d 251, 265 (Tex.App.—Corpus Christi 1987, writ ref'd n.r.e.).

■ Under the common law of Texas, attorneys' fees are not recoverable in the absence of a specific statutory or contractual provision. *New Amsterdam Casualty Co. v. Texas Industries*, 414 S.W.2d 914, 915 (Tex. 1967). The appellants contend that because Monsanto has not pointed to any specific statutory or contractual authority authorizing the recovery of attorneys' fees in a case of this nature, the trial court erred in awarding Monsanto the attorneys' fees that it expended in the defense of the *Slaughter* litigation.

In *Baja Energy, Inc. v. Ball*, 669 S.W.2d 836, 838–39 (Tex.App.—Eastland 1984, no writ),[21] the Eastland Court of Appeals explained that several courts have allowed recovery for attorneys' fees and other litigation expenses of a previous suit when the plaintiff in the present suit was required to prosecute or defend the previous suit as a consequence of a wrongful act of the defendant. *See also Texoma AG–Products v. Hartford Accident & Indemnity Co.*, 755 F.2d 445, 450 (5th Cir.1985); *Nationwide Mut. Ins. Co. v. Holmes*, 842 S.W.2d 335, 341 (Tex.App.—San Antonio 1992, writ denied). The court in *Baja* further stated that when a wrongful act involves the claimant in a litigation where third parties force the claimant to incur expenses to protect his interests, such costs and expenses, including attorneys' fees, are treated as a legal consequence of the original wrongful act and are permitted to be recovered as damages. *Baja*, 669 S.W.2d at 839. The present case is analogous to a malicious prosecution case in which a party is wrongfully required to defend a case. In such a case, costs and attorneys' fees of the first case are proper recoveries. *See Eans v. Grocer Supply Co.*, 580 S.W.2d 17 (Tex.Civ. App.—Houston [1st Dist.] 1979, no writ). Monsanto is entitled to recover its defense costs in *Slaughter* as the proper measure of damages from the appellants due to their wrongful manipulation of the *Slaughter* case. These points of error are overruled.

## Sufficiency of the Evidence on Damages

The appellants next contend that the evidence presented to the jury was legally or, alternatively, factually insufficient to support the jury's answer to the question on damages. They assert that Monsanto failed to factually establish the amount of damages that were caused by the alleged deceptive conduct as required by *Kish*, 692 S.W.2d at 466. They contend that Monsanto would have incurred great financial expense in defending the claims made against it in *Slaughter* even if the Mary Carter agreements had never been signed and none of the alleged wrongful conduct had occurred. Alternatively, they contend that at the most, Monsanto could recover only the amount of expenses exceeding the amount that it would have incurred without the intervention of the appellants.

■ The proper causation standard under the DTPA is producing cause. *Pope v. Rollins Protective Services Co.*, 703 F.2d 197 (5th Cir.1983); *Riojas v. Lone Star Gas Co., A Division of Ensearch Corp.*, 637 S.W.2d 956 (Tex.Civ.App.—Fort Worth 1982, writ ref'd n.r.e.). *Producing cause* means the efficient, exciting, or contributing cause. This standard is sometimes referred to as factual causation and lacks the element of foreseeability that is embraced by the standard of proximate causation. *Riojas*, 637 S.W.2d at 959.

■ There can be more than one producing cause. *Rourke v. Garza*, 530 S.W.2d 794 (Tex.1975). In a case like *Celotex Corp. v. Tate*, 797 S.W.2d 197 (Tex.App.—Corpus Christi 1990, no writ), when the tortious conduct of two or more actors is combined to bring about harm to the plaintiff, the burden of proof as to apportionment among the defendants rests on each actor. Thus, in an asbestosis case, where it is difficult to determine exactly which exposure to asbestos dust is responsible for the resulting asbestos-related disease, the burden shifts to the defendants to exculpate themselves. But in the present case the appellants do not ask that

**21.** The Dallas Court of Appeals in *Peterson v. Dean Witter Reynolds, Inc.*, 805 S.W.2d 541, 549 (Tex.App.—Dallas 1991, no writ), declined to follow *Baja Energy v. Ball*, 669 S.W.2d 836 (Tex. App.—Eastland 1984, no writ).

the liability be apportioned among them. Rather, they contend that there should be no liability because the plaintiffs in *Slaughter* would have pursued their cause of action anyway, which they had every legal right to do; thus, Monsanto would have incurred the same amount of attorneys' fees in defending the action as it would when the appellants controlled the litigation. Monsanto also cites *Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2*, 415 S.W.2d 890, 897 (Tex.1967), for the proposition that it was not required to show what would have happened in the absence of the Mary Carter agreements or the appellants' wrongful pursuit of Monsanto. Again, the *Bildon Farms* case deals with apportionment of damages among tortfeasors, stating that all the law requires is that the best evidence of which case is acceptable be produced. This does not relieve Monsanto in the present case from showing that but for the conduct of the appellants, it would not have been damaged.

Whether we are dealing with proximate cause or producing cause, the cause-in-fact test is the same. As the Supreme Court said in *Travis v. City of Mesquite*, " 'Cause in fact' means that the act or omission was a substantial factor in bringing about the injury, and without it harm would not have occurred." *Travis v. City of Mesquite*, 830 S.W.2d 94 (Tex.1992). This ruling concerning a substantial factor was reiterated in the recent case of *Kramer v. Lewisville Memorial Hospital*, 858 S.W.2d 397 (Tex.1993). The Second Restatement of Torts contains the following section:

§ 432. Negligent Conduct as Necessary Antecedent of Harm

(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.

(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

RESTATEMENT (SECOND) OF TORTS § 432 (1965).

■■■ Although the foregoing section is applicable to causation and negligence actions, actual causation is a requirement in cases involving intentional conduct as well. Under Article 21.21 of the Insurance Code, proof of causation is necessary to establish that damages alleged were factually caused by the defendant's conduct. *First American Title Co. v. Prata*, 783 S.W.2d 697 (Tex.App.—El Paso 1989, writ denied).

Thus, in the present case, if the jury believed that the continued litigation against Monsanto would have occurred even if the appellants had not interceded, then no damage would have been incurred by Monsanto because of their intervention. The jury, however, had evidence from which it could have concluded that the plaintiffs' cause of action would not have proceeded against Monsanto if it had not been for the intervention of the appellants. Robert Marett, an attorney who represented some of the plaintiffs in the *Slaughter* case, testified that he did not assert any claims for physical injuries against the chemical companies, and if the developers had not added the chemical companies as third-party defendants, he did not intend to assert any claims against them. He further testified:

I mean, we had a case against Farm and Home. We felt like that was the best case. We were ready for it. We—I had been involved in it for two or three years. I knew the case backwards and forwards. My clients were anxious to get to trial. We felt like we could have gotten all the damages we could have out of the developers; and why drag in, you know, all these 30 chemical companies that may prolong this case for three or four more years.

He furthermore testified that he and Farm & Home were willing to dismiss Monsanto and that willingness did not change while he was involved in the lawsuit. He also testified that his clients would have been willing to accept a settlement offered by Farm & Home and some other companies which did not include Monsanto, as a final settlement of all claims. He stated that this was based upon the amount the plaintiffs received in the

*Jones* case—$96,000 per house—and that his clients thought that that would be an adequate amount of compensation without continuing against Monsanto. Thus, based upon this evidence, the jury had evidence to support its finding of causation on the basis that the plaintiffs themselves would not have proceeded against Monsanto except that they were required to do so under the settlement, under which the appellants would profit from the recovery against Monsanto. We find the evidence legally and factually sufficient to support the jury's finding of damages. These points of error are overruled.

**Mitigation**

The appellants next contend that the trial court erred by rejecting the requested jury instruction on mitigation. They contend that they pleaded Monsanto's failure to mitigate, submitted evidence on the issue, and submitted a proper mitigation instruction. They contend that Monsanto failed to mitigate its damages in that it refused an opportunity to settle the case early for less than ten percent of what it ultimately paid in attorneys' fees and expenses. Furthermore, the appellants contend that Monsanto actually increased its attorneys' fees by its purposeful discovery abuses.

 The general rule is that damages that may have been avoided or mitigated are not recoverable. *Moulton v. Alamo Ambulance Serv., Inc.,* 414 S.W.2d 444, 449 (Tex. 1967). An injured party must use reasonable efforts to avoid or mitigate its losses. *Pulaski Bank & Trust Co. v. Texas American Bank,* 759 S.W.2d 723, 735 (Tex.App.—Dallas 1988, writ denied). A court should submit a mitigation instruction when the evidence raises an issue as to whether the plaintiff could have avoided, in whole or in part, the losses that he seeks to recover. *Alexander & Alexander v. Bacchus Industries,* 754 S.W.2d 252, 253–54 (Tex.App.—El Paso 1988, writ denied).

 An injured party is required under the doctrine of avoidable consequences to use reasonable diligence to minimize his loss-

es, but he is not required to sacrifice substantial rights of his own. *Bank One, Texas, N.A. v. Taylor,* 970 F.2d 16 (5th Cir.1992). A party has a substantial right to defend his lawsuit. A rule requiring settlement over victory because the attorneys' fees to win the case may cost more than the settlement is repugnant to our system of justice. In the tradition of "[m]illions for defense, but not one cent for tribute," [22] the party who believes that its cause is right and meritorious under the law has no duty to settle just to avoid attorneys' fees. (This is not to be confused with a case when a party believes it has no chance of winning but wants to force a settlement based upon the attorneys' fees that the other side would have to incur.) In the present suit, Monsanto's belief in the merits of its case met the ultimate test: Monsanto won. There was no duty to mitigate by settling. Furthermore, the evidence shows that Monsanto decided not to settle the *Slaughter* case before the appellants took control of the *Slaughter* plaintiffs' case. No duty to mitigate damages preexists the wrongful conduct giving rise to the plaintiff's injury. *King Son Wong v. Carnation Co.,* 509 S.W.2d 385, 387 (Tex.Civ.App.—Houston [14th Dist.] ), *writ ref'd n.r.e. per curiam,* 516 S.W.2d 116 (Tex.1974).

 As to damages resulting from discovery abuse in *Slaughter,* Monsanto takes the position that it did not seek to recover the legal fees related to the discovery abuse. Monsanto had been sanctioned by being required to pay $190,000 to opposing counsel in *Slaughter* because of discovery abuses that the trial court found had been committed by Monsanto. Monsanto made a motion in limine that included the following:

> Monsanto has provided Defendants with a detailed description of each cost or expense incurred in the Brio Site Litigation that Monsanto is seeking to recover in this action. There were a few costs incurred that Monsanto is not seeking to recover. These include pre-trial discovery sanctions that Monsanto paid and the costs associated with responding to the preceding mo-

---

**22.** Robert Goodloe Harper, *Toast for John Marshall* (June 18, 1798), *quoted in* JOHN BARTLETT, FAMILIAR QUOTATIONS 416 (15th ed. 1980).

tions for sanctions, some billing errors, and some miscellaneous costs that Monsanto has decided not to sue for.

Defendants should be ordered to refrain from making any reference to these costs. Since Monsanto is not seeking to recover any of them, they are totally irrelevant. Furthermore, reference to some of them, such as the sanctions, would unfairly prejudice Monsanto by confusing the jury. References to the sanctions that were imposed could lead the jury to conclude that the *Slaughter* court determined that Monsanto had committed one or more wrongful acts at the Brio Site when such is not the case. Monsanto could explain what the sanctions order did mean, and the circumstances surrounding its entry, but to do so would needlessly delay the trial of the real issues in this case. The hearing on one of the motions for sanctions took three days to complete. There is no need to delay the trial of this case by rehashing these arguments when Monsanto is not seeking to recover these costs. The Defendants should be ordered to refrain from making any reference to the sanctions order, the request for sanctions, the fact that sanctions were imposed (even without reference to the amount), or any other matters which reflect costs Monsanto is not seeking to recover.

This motion was granted. This order, of course, did not prevent the appellants from examining the witnesses outside the presence of the jury to make a record showing that such charges related to the discovery abuse were not deducted.

Monsanto introduced the amount of Crum & Forster's legal fees for purposes of comparison to the Monsanto fees. The appellants complained at the trial that Crum & Forster's legal fees had been enormously increased by the discovery abuses of Monsanto. During this discussion before the court, Monsanto offered to back out the amount in evidence that Crum & Forster expended because of the discovery abuse if the appellants would submit a figure to the court. The appellants stated that they could not come up with a number to back out from their fees. It was at this point during the discussion that Monsanto stated that it had estimated its fees attributable to the discovery sanctions to be $125,000. We have been referred to no other reference to the $125,000, and we have found none.

When Monsanto was proving the amount of the damages, its expert testified that the total expenses paid by Monsanto for the *Slaughter* litigation was $13.6 million. He further testified that some of the costs had been taken out because they were not directly attributable to the defense of this lawsuit. He testified that he had divided the costs into two increments, *Slaughter* before May 1988, $494,500, and *Slaughter* after May 1988, $13,069,287. There is no suggestion about what fees were left out that were not attributable to the defense. This witness was not cross-examined before the jury or outside the presence of the jury about the amount that was omitted and why it was omitted.

In an offer of proof outside the presence of the jury, the appellants asked their expert witness, Tom McGarity, about the legal fees that were caused by abusive discovery tactics engaged in by Monsanto. The witness answered:

> I think that the Waldeck firm's legal fees were substantially increased because of the foot-dragging that went on by Monsanto in discovery in the Slaughter case.
>
> . . . .
>
> Mr. Waldeck testified that it probably added a year to the time that it took to get to trial for his firm. I have no reason to dispute that.

The appellants, however, referred us to no evidence, nor did they reveal in any way in cross-examination or in the records admitted into evidence, any amounts that Monsanto had included for attorneys' fees related to the discovery abuse. They made a number of offers of proof that there had been discovery abuse by Monsanto, but none of this evidence showed that Monsanto included the time spent on discovery abuse as part of its attorneys' fees. The judge justifiably used her discretion under Rule 403 of the Texas Rules of Civil Evidence to exclude the evidence concerning the sanctions when finding that the probative value was substantially

outweighed by the danger of unfair prejudice. The amount, however, attributable to the conduct involving discovery abuse could have been deducted without reference to the trial court's finding of discovery abuses, just as the testimony of Monsanto's expert stated that some amounts were being backed out of the total figure. The appellants have pointed to no evidence of any nature that would indicate that the attorneys' fees attributable to the discovery abuses were included in its figure for attorneys' fees. Without any showing in the evidence that such a figure was included, based upon the evidence in support of the amount of damages, there was no duty to submit an instruction of mitigation on this basis, nor can we conclude on appeal that the amount of damages was not properly proven.

While it is commonly said that the injured party has a duty to minimize damages, this is a misnomer. The victim owes no duty to the person who hurts him, and the correctly stated principle is that the injured party may not recover damages that do not result proximately from the defendant's breach of duty, and thus damages that might be avoided or mitigated are not recoverable. *Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129 (5th Cir.1985). Question 6 was limited to a recovery that would "fairly and reasonably compensate Monsanto for its damage or injury." The jury was instructed that this figure should be based upon the cost that resulted from such acts or conduct by the appellants. This sufficiently covered the issue, and it was not error for the trial court to omit the instruction on mitigation submitted by the appellants. These points of error are overruled.

## EVIDENTIARY RULINGS

■ The appellants next contend that the trial court made numerous erroneous and inconsistent evidentiary rulings, thus causing the rendering of an improper judgment. The standard of review for the admission or exclusion of evidence is abuse of discretion. *Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d 376, 389 (Tex.1965). Evidentiary rul-

ings will not be the grounds for reversal unless the outcome of the case turns on the particular evidence erroneously admitted or excluded. *CNA Ins. Co. v. Scheffey*, 828 S.W.2d at 790.

### Inconsistent Evidentiary Rulings

The appellants contend that they were deprived of a fair trial because of the trial court's inconsistent evidentiary rulings. As this Court said in *Fibreboard Corp. v. Pool*, the sustaining and overruling of objections is not done by quotas but must be based upon the merit of each objection. We have endeavored to address all rulings which were complained about on appeal and which were properly preserved as error in the trial court. *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 696 (Tex.App.—Texarkana 1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 2339, 124 L.Ed.2d 250, *and* —— U.S. ——, 113 S.Ct. 3037, 125 L.Ed.2d 724, *and* —— U.S. ——, 113 S.Ct. 3064, 125 L.Ed.2d 746 (1993).

### Exclusion of Testimony

Before trial, in response to motions in limine filed by both sides seeking exclusion of testimony regarding legal conclusions, the trial court stated that it would bar such testimony from reaching the jury. The appellants contend that the trial court later reversed its position in allowing Jeff Parsons to testify.

■ Whether the testimony violated the motion in limine is not the issue before this Court. The trial judge at any time can alter or withdraw a motion in limine as long as the ruling is based upon legal principles.

■ The appellants first contend that the trial court erred in allowing Monsanto's expert witness, Parsons, to testify regarding the propriety of the Mary Carter agreements,[23] while at the same time limiting the defendants' opportunity to respond. Parsons testified, over the repeated objections of the appellants, that the Mary Carter agreements between the *Slaughter* plaintiffs and Farm & Home were illegal and against Texas public policy. He stated specifically that the agree-

---

23. Mary Carter agreements generally were declared illegal in *Elbaor v. Smith*, 845 S.W.2d 240

(Tex.1992) (not retroactive unless in the judicial pipeline with error preserved).

ments, at the time that they were entered into and in the manner in which they were entered into, were against the public policy of the State of Texas as pronounced by our Supreme Court. He cited *Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19, and *International Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932, as supporting his position.

■■■■■ The Texas Rules of Civil Evidence do not specifically forbid a witness from testifying to legal conclusions interpreting the law for the jury. This is perhaps because matters of law are not a function for the jury and are not evidentiary in nature. In the early days of the jury, *law* and *fact* were used as short terms for the respective functions of judge and jury. Green, *Judge and Jury,* 278 (1930). The jury's role was and continues to be merely to find the facts, and then the court is to pronounce the law based upon the facts found. TEX.R.CIV.P. 300, 301; *Young v. Kilroy Oil Co.,* 673 S.W.2d 236 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). The basis for not allowing a witness to give a legal conclusion when qualified to do so is because matters of law must be decided and applied solely by the judge trying the case. *See Faulkner v. Thrapp,* 616 S.W.2d 344 (Tex.Civ.App.—Texarkana 1981, writ ref'd n.r.e.) (Cornelius, C.J., concurring). The trial judge, who is presumed to have special competency in this area, can determine matters of law without testimony. Thus, under Texas law, a witness may not give legal conclusions or interpret the law to the jury. *Puente v. A.S.I.P. Signs,* 821 S.W.2d 400, 402 (Tex.App.—Corpus Christi 1991, writ denied). At common law, courts refused to permit witnesses to render opinions on mixed law and fact ques-

tions. *See* Frederick C. Moss, *Beyond the Fringe: Apocryphal Rules of Evidence in Texas,* 43 BAYLOR L.REV. 701, 751 (1991). An expert now, however, may offer his or her opinion as to a mixed question of law and fact, so long as that opinion is based on proper legal concepts. *See* TEX.R.CIV.EVID. 704; *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 365 (Tex.1987).[24]

■■■■■ While we have found no Texas case defining mixed questions of law and fact, Texas cases give us guidance by telling us that such concepts as negligence and proximate cause can be mixed questions of law and fact. *Birchfield,* 747 S.W.2d at 365. BLACK'S LAW DICTIONARY 1003 (6th ed. 1990) defines a mixed question of law and fact as "[a] question depending for solution on questions of both law and fact, but is really a question of either law or fact to be decided by either judge or jury." With all due respect to the lexicographers, this definition says nothing in a way that leaves nothing unsaid. A better definition is that an opinion or issue involves a mixed question of law and fact when a standard or measure has been fixed by law and the question is whether the person or conduct measures up to that standard.[25]

Texas Rule of Civil Evidence 702 provides that an expert witness is one who has knowledge that will assist the trier of fact to understand the evidence or determine a fact issue.[26] In our system, the trial judge does not generally instruct the jury as to the law of the case until all the evidence is in, but in a case with complex factual and legal issues such as this, it may be difficult for the jury to understand the ramifications of the evidence

---

**24.** There has been much written about whether the Texas Rules of Civil Evidence intended to open the door to mixed questions of law and fact, but regardless of the initial intent, the Supreme Court, through *Birchfield v. Texarkana Memorial Hospital,* 747 S.W.2d 361 (Tex.1987), has declared this evidence to be admissible.

**25.** *See* Charles W. Ehrhardt, *The Conflict Concerning Expert Witnesses and Legal Conclusions,* 92 W.VA.L.REV. 645 (1990).

**26.** An unknown author offered this cynical explanation of the relationship between experts, the legal profession and the judiciary:

Experts are people who know a great deal about very little, and who go along learning more and more about less and less until they know practically everything about nothing.

Lawyers, on the other hand, are people who know very little about many things, and who keep learning less and less about more and more until they know practically nothing about everything.

Judges are people who start out knowing everything about everything, but end up knowing nothing about anything, due to their constant association with experts and lawyers.

without guidance while it is being introduced. Any legal explanation by the judge during the introduction of the evidence might be construed as an impermissible comment on the weight of the evidence, and judges are not generally prepared at that point in the trial to give such instructions.

To the extent that the witness discussed both the law and its application in the factual context of the case on trial, the testimony involved a mixed question of law and fact. Most of Parsons's testimony pertained to the facts of the case, but his testimony is sprinkled with legal ramifications. As we previously stated, this is a case about litigation, and it would be impossible to discuss the case without bringing in legal principles. For example, he explained the term *subrogation* to the jury. The defining of this term is in a sense legal, but at the same time it is also an insurance term and the definition was helpful to the jury in understanding the testimony. The appellants' main complaint was Parsons's testimony giving his opinion that Crum & Forster's conduct in connection with the Brio Site litigation was improper and against the public policy of the State of Texas. This clearly involved a mixed question of law and fact. The appellants also complain about the explanation of the legal meaning of a Mary Carter agreement. To the extent that the legal principles involving a Mary Carter agreement were applied to the facts in this case, this constitutes a question of mixed law and fact.

The appellants further complain that even if Parsons's testimony is viewed as relating to a mixed question of law and fact, this testimony was not supported by a proper legal predicate as is necessary for such testimony to be properly admitted, citing *E-Z Mart Stores, Inc. v. Terry*, 794 S.W.2d 63, 64–5 (Tex.App.—Texarkana 1990, writ denied). The *E-Z Mart* case is distinguishable from the present case because in the *E-Z Mart* case the safety expert was not shown to know the proper legal definition of negligence, whereas in the present case the expert witness was shown to know the legal principles about which he spoke. In the *E-Z Mart* case, this Court held that an expert may give an opinion regarding ultimate is-

sues as long as the opinion is confined to relevant issues and is based on proper legal concept. In the *E-Z Mart* case, the proper predicate was not laid to show that the expert was familiar with the proper legal definition about which he was testifying. Appellants contend that there is no legal authority to support Parsons's legal conclusions, but as they pointed out, the trial court apparently agreed with these legal conclusions and used the conclusions in phrasing jury Question 5(a). This suggests that the trial court agreed with Parsons's interpretations of the two cases in question. *International Proteins Corp. v. Ralston–Purina Co.*, 744 S.W.2d 932; *Beech Aircraft Corp. v. Jinkins*, 739 S.W.2d 19. We do not agree that Parsons's testimony was not based upon a proper legal predicate.

■ The appellants further complain that the trial court erred in refusing to permit the defendants to fully respond to Parsons's testimony. The trial court refused to allow the appellants to call Thomas McGarity, a University of Texas law professor, and another expert witness, who were expected to testify that, in their opinions, the Mary Carter agreements in the *Slaughter* case were not against public policy when executed. The appellants were allowed to present two of their experts' responses to Parsons's testimony: Waldeck, the *Slaughter* plaintiffs' attorney, and James Wallace, a former Supreme Court Justice. It has not been shown that the testimony of the two excluded witnesses would have been more than cumulative of the other testimony offered by the appellants. *See Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d at 389. These points of error are overruled.

### Excluding Monsanto's Motion for Partial Summary Judgment in the *Slaughter* Case

■ ■ The appellants also contend that the trial court erred in striking from evidence Monsanto's motion for partial summary judgment and the denial of that motion in the *Slaughter* case. These documents could have been used to impeach Parsons if they reflected a different legal opinion being urged by Monsanto than the legal opinions set forth by Parsons. These documents were

not admissible to show that the trial court's denial of the motion for summary judgment in the *Slaughter* case constituted a disapproval of Monsanto's claim in the present case. If the appellants wished to keep these documents in the record for the limited purpose of impeaching Parsons, they should have offered them for that limited purpose under Rule 105(b) of the Texas Rules of Civil Evidence. A trial court has broad discretion to allow or deny the withdrawal of evidence from the record once it has been presented to the jury. *Murphy v. Waldrip*, 692 S.W.2d 584, 589 (Tex.App.—Fort Worth 1985, writ ref'd n.r.e.). These points of error are overruled.

### Evidence of Reinsurers

■ The appellants contend that the trial court allowed Monsanto to paint a distorted picture of the motive behind the appellants' involvement in the *Slaughter* case, but the trial court refused to allow the appellants to present motive evidence rebutting Monsanto's. Specifically, the appellants contend that the trial court erred in refusing to admit evidence regarding the amount of any recovery in *Slaughter* that would go to outside reinsurers and regarding the good faith belief of their attorneys in the merit of the alleged statutory violations and personal injury claims.

The appellants first complain that the trial judge erred in refusing to allow them to introduce evidence of the amount of any recovery obtained in the *Slaughter* suit that would have been paid to reinsurers. The trial court excluded this evidence as a discovery sanction.

During opening argument, Monsanto's counsel suggested that the appellants could have made as much as $200 million from their manipulation of the *Slaughter* case. Monsanto's expert, Eugene McWilliams, testified that the appellants had attempted to obtain at least $71 million in the litigation, and he demonstrated how the money would be shared by the appellants. The appellants contend that through such statements Monsanto created a highly distorted picture of the extent of their involvement in the

*Slaughter* litigation, to which they were entitled to respond.

The trial court initially allowed the appellants to present testimonial evidence regarding the fact that any subrogation reimbursement received by the appellants would in large part be paid to outside reinsurers, but the trial court later modified that ruling so as to limit it to evidence of general reinsurance obligations but not specific amounts of reimbursement. Later, the trial court decided to exclude any reference to reinsurance evidence whatsoever.

The trial court excluded evidence of specific amounts owed to reinsurers as a means of sanctioning the appellants for not answering an interrogatory. This was an improper exclusion because they had properly objected to that interrogatory and Monsanto failed to seek a hearing on the objection, thus leaving the appellants with no obligation to answer the interrogatory or supplement their discovery. Rule 168(6) of the Texas Rules of Civil Procedure states: "Answers only to those interrogatories ... to which objection is made, shall be deferred until the objections are ruled upon and for such additional time thereafter as this court may direct." *See McKinney v. National Union Fire Ins. Co.*, 772 S.W.2d 72, 75 (Tex.1989). Although either party may request a hearing on objections, the Rule clearly states that the filing of answers is deferred until the objections are ruled upon. Rule 166b(4) of the Texas Rules of Civil Procedure provides that an objection made by a party to discovery shall preserve that objection without further support or action by the party unless the objection or motion is set for a hearing and determined by the court.

Monsanto urges that the appellants had failed to supplement their response to this interrogatory; however, there had been no response because of the objection, and there is no duty to supplement until the answer comes due after the ruling on the objection. This was not a situation in which the answer to discovery was no longer true and complete, because the answer had been withheld because of the objection. *See Boothe v. Hausler*, 766 S.W.2d 788 (Tex.1989). A few days before the commencement of the trial,

Monsanto filed a motion for sanctions to exclude the evidence. They asked that the appellants be denied the opportunity to present any evidence of portions of the *Slaughter* recovery that would have been for the benefit of reinsurers. The appellants stood by their original answer that the question was not relevant, not discoverable, and not reasonably calculated to lead to the discovery of admissible evidence. The matter was apparently never set for hearing, and there was no ruling upon the objections. The appellants further contend that they did file an answer to Interrogatory 14, but Monsanto complained that it was filed two days prior to the trial, which was too late for Monsanto to make any further discovery. Monsanto filed a motion to exclude the evidence that reinsurers would have been paid out of the *Slaughter* recovery.

■ Monsanto takes the position that because the appellants had objected to the question as being irrelevant, it was irrelevant when the appellants tried to introduce this matter. The term *relevance* in the context of discovery is broader than in the context of admissibility into evidence only and includes anything reasonably calculated to lead to the discovery of material evidence and is a proper objection. *Collier Services Corp. v. Salinas,* 812 S.W.2d 372, 376 (Tex.App.—Corpus Christi 1991, no writ), and cases cited therein.

■ Although the appellants' positions seem inconsistent, they are entitled to make their objection to discovery, and they are not bound by that position if action by the opposing party during the course of the trial opens the door to such evidence and makes it then become relevant to the proceeding. The appellants contend that this matter became relevant when Monsanto told the jury that they were going to benefit in the *Slaughter* case by more than $100 million.

■ The trial court ruled that the specifics were not supplemented on Interrogatory 14: "I mean the specifics were not supplemented and so he is not going to ask this witness about that." But the appellants were allowed to put in general evidence of reinsurance:

Q Now, Mr. Shumaker, do I understand that when an insurance company makes a payment on behalf of an insured, sometimes that insurance company might have outside reinsurance?

A Yes.

Q And if that outside reinsurer contributes money to help make the payment on behalf of the insured, is it a fair statement and an accurate statement that if subrogation is pursued and money is recovered to the extent the reinsurer has paid any of that lost, the reinsurer gets to be reimbursed?

A They would get their proportionate amount back, yes.

. . . .

Q You indicated that the plaintiffs' attorneys at that time were seeking $92 million for the 352 homeowners who had filed suit as of that date, do you see that?

A That's correct.

Q That is information, I take it, that was available to you when the $42 million estimate was developed?

A Yes.

. . . .

Q And that says since we incurred our net retention in 1985, the entire $20 million will be coded to reinsurance. Would you explain that, please?

A Well, the reinsurance arrangement, the way I remember it, is that there is the initial $5 million referred to as the retention was to be borne entirely by the insured which would have been Crum and Forster Corporation. There was a series of layers above that reaching the policy limit that would have been ceded to, insurance term, to those *particular reinsurers or groups of reinsurers* and they would have paid them in their entirety, reimbursed the company, after the payment was made.

(Emphasis added.)

We find that the trial court erred in refusing to allow the appellants to put on evidence of the specific amounts of reinsurance applicable to the *Slaughter* case.

In order for an error to be reversible, it must be reasonably calculated to cause and probably did cause rendition of an improper judgment in the case. TEX. R.APP.P. 81(b)(1). Because the appellants were allowed to put on evidence generally that they would be required to reimburse reinsurers out of any recovery, we do not find the exclusion of the specific amounts to be reversible error.

We next address the contention that the appellants were not allowed to mention reinsurance generally in the final argument. Litigants generally have the right to discuss all matters in evidence in their closing argument. *Circle Y of Yoakum v. Blevins*, 826 S.W.2d 753, 756 (Tex.App.—Texarkana 1992, writ denied). The ruling on that point was as follows:

THE COURT: ... There are matters that I have excluded and I trust that you all will not venture into them.

. . . .

THE COURT: ... References about the motion for summary judgment, the summary judgment order, we have already brought that up this morning and I've excluded those and I don't want them being referred to. Comments about PCB's or V's or whatever they are—

. . . .

THE COURT: —"Seep of Death" and that sort of thing, I trust we will not be going into those. . . .

I've excluded Sadow. . . . I don't want him referred to or what he—you know, anything in that regard. I can't remember any of the others off the—

MR. BROWN: You mentioned the trust fund that Plaintiffs were not to—

THE COURT: Agent Orange.

MR. BROWN: You mentioned that the Plaintiff was not to mention the trust fund.

THE COURT: We are not going to argue the trust fund unless you all open it up.

. . . .

THE COURT: No, I don't want references to the sanction order or the millions of boxes of—that whole line of testimony that I have excluded about boxes being concealed and not produced until time of trial.

MR. NORRIS: ... but there is testimony that has been received in the record through Mr. Berendt and others. Are you ordering that I can't speak to that?

THE COURT: No, not the evidence that's in the record and *that I haven't excluded or sustained objections to.* (Emphasis added.)

The next day the following conference occurred before the final arguments:

THE COURT: ... The second thing is anything that *I have previously liminied out, stays out;* or *if I've ruled it inadmissible, stays out.* And no references are to be made to it at all, which includes Slaughter sanctions, summary judgment motion and order, discovery disputes, Agent Orange, PCBs, "Seep of Death," the *Texas Monthly* article—

MR. GARNER: I reread the motion in limine.

THE COURT: Okay. Well, there's new stuff since then, I mean, the Sadow. I don't want to go into anything, what he may have known or not known, the reinsurance, et cetera.

MR. GARNER: The Reed insurance?

THE COURT: The reinsurance.

MR. GARNER: Reinsurance.

THE COURT: Okay. And the rule is this: If it's gone into, then whoever goes into that kind of thing, sits down. Okay? And I will take your kindly remarks about how you sure did and "I forgot," but this time, if you do it—this time if you do it, that's the end of your argument. And I don't want to cut them off from the pleasure of your argument. (Emphasis added.)

The question is whether the trial judge was precluding reinsurance in general from the argument or only the specifics of reinsurance that had been excluded from evidence. In the context with Sadow, it appears that the reinsurance may have related to what Sadow may have known or not known. This witness, however, had nothing to do

with the reinsurance. Throughout the instruction, the trial judge states that she is excluding what she has ruled to be inadmissible and is not in evidence. This applies to the specifics of reinsurance, but it does not apply to the general references to reinsurance that were introduced into evidence. The ruling is somewhat ambiguous and placed a burden upon the appellants to make further inquiry if they were not sure about the court's ruling relating to reinsurance. These points of error are overruled.

### Evidence on Good Faith Belief of Statutory Violations

 The appellants next contend that the trial court erred in refusing to allow them to present evidence establishing the validity of the statutory violations claims made against Monsanto in *Slaughter* because such evidence was relevant to jury Question 5(c). The basis of Monsanto's allegations under Question 5(c) was that the appellants emphasized statutory violations in *Slaughter* for the purpose of excluding International from liability under its EIL policies. In a motion in limine, Monsanto requested that the trial court exclude all evidence regarding Monsanto's culpability for the Brio Site hazards that were discovered in the preparation of the *Slaughter* trial. The appellants contend that this evidence was necessary to prove that the statutory and other claims raised against Monsanto were raised in good faith. The trial court found, however, that a relitigation of the *Slaughter* suit was not appropriate because of the time constraints of the trial, because the *Slaughter* jury had already resolved the issue of liability in the *Slaughter* case, and because the issue of liability in *Slaughter* was not an issue in the present case.

Much of the excluded evidence was aimed at explaining why Monsanto became the primary target of the litigation. Under Question 5(c), the reason behind targeting Monsanto as the primary defendant and releasing the other defendants was not a rebuttal point that could help the appellants. Although narrowing the liability to Monsanto alone could potentially mean more liability on the insurance coverage by International, this type of evidence does not show why the suit suddenly placed emphasis on statutory violations. In looking at the offers of proof that the appellants filed, we find numerous documents pointing an accusing finger at Monsanto as the chief culprit in polluting the Brio Site. If the trial court had allowed this type of evidence into the trial, Monsanto would have responded as it did in the *Slaughter* litigation, and the liability aspects of the *Slaughter* case would have been relitigated.

Appellants complain because Waldeck was not allowed to testify that his team of attorneys discovered that Monsanto was the party solely responsible for putting hazardous waste at the Brio Site and that he believed Farm & Home had valid claims against Monsanto for damages. This evidence does not rebut the allegation that the appellants attempted to manipulate the suit to find liability primarily on the basis of statutory violations.

The appellants offered exhibits consisting of letters from various attorneys representing third-party defendants in the *Slaughter* case to the trial judge explaining why they should be nonsuited, as they eventually were when the focus of the litigation shifted to Monsanto. These self-serving letters by attorneys wanting out of the lawsuit do not show conduct by the appellants which would show good faith in altering this suit to emphasize statutory violations.

The appellants do complain about the exclusion of one piece of evidence which addresses the issue of statutory violations. In an offer of proof, environmental law expert Thomas McGarity stated that certain government documents he reviewed "[p]rimarily ... dealt with the violations of environmental laws that occurred at the Brio Site in Friendswood, Texas, and some of them dealt with Monsanto's relation to that site." McGarity further stated that the violations occurred "from 1970 on through 1976, '77,- '78, somewhere in that range." These statements are the only mention of statutory violations in McGarity's testimony.

Several points remain unclear regarding this testimony and the alleged statutory violations. First, McGarity does not explicitly state an opinion on whether Monsanto was

responsible for the alleged violations. Second, the testimony does not reveal when the attorneys for the *Slaughter* plaintiffs received these government documents. Because the documents may have been revealed before the Crum & Forster subsidiaries became involved with the plaintiffs' case, McGarity's comments do not necessarily demonstrate a good faith belief on the part of the appellants' attorneys regarding the statutory violations. And third, McGarity's comments do not relate the alleged violations to the *Slaughter* plaintiffs' case.[27]

As we discussed above, the trial court has discretion in determining which evidence to admit and which to exclude. *See Champlin Oil & Ref. Co. v. Chastain*, 403 S.W.2d at 389. We find that the trial court did not abuse its discretion in refusing to admit the evidence cited by the appellants regarding the alleged statutory violations.

**Evidence on Personal Injury Claims**

▮▮▮ The appellants next contend that the trial court erred in refusing to admit evidence demonstrating that the *Slaughter* plaintiffs had complained of personal injuries before the Mary Carter agreements were signed in May 1988. The appellants insist that the trial court allowed Monsanto to suggest to the jury that the attorneys hired in May 1988 to represent the plaintiffs instituted the personal injury claims in *Slaughter* as a means of increasing the potential proceeds that could be earned from the case. Specifically, the appellants contend that the trial court wrongfully excluded numerous affidavits of *Slaughter* plaintiffs regarding bodily injuries, a letter in which one attorney representing the plaintiffs informed another attorney representing the plaintiffs about a client with leukemia, and a lengthy fax wherein the settlements in the other phases of the Southbend litigation were detailed.

The personal injury claims do not tie into the issue inquired about in Question 5(a), being that certain defendants committed de-

ceptive conduct against Monsanto. The fact that the attorneys pursued the most rewarding possible causes of action, e.g., the personal injury claims, does not suggest that the conduct was deceptive. The challenged evidence was, therefore, irrelevant to Question 5(a). Because Question 5(c) did not ask about personal injury claims as a basis for denying coverage under International's EIL policy and nothing in the record suggests that these claims were related to the statutory violations claims, the evidence on personal injury claims was not relevant to Question 5(c).

Furthermore, other evidence reached the jury that suggested that claims of bodily injury had existed before the Mary Carter agreements were signed in May 1988, thus the evidence rejected by the court was merely cumulative. Mike Waldeck, an attorney representing the *Slaughter* plaintiffs after May 1988, testified before the jury that personal injury claims were made before May 1988; Waldeck also stated that he had spoken with Marett, the attorney representing the *Slaughter* plaintiffs before May 1988, regarding a client's leukemia; Robert Berendt, a witness called by Monsanto, likewise stated that personal injury claims existed before 1988; and pleadings containing such allegations, which were filed prior to May 1988, were also admitted.

The trial court did not abuse its discretion in refusing to admit further evidence regarding the personal injury claims because this evidence was cumulative and irrelevant. These points of error are overruled.

**Trust Fund Evidence**

▮▮▮ The appellants also complain about the trial court's failure to strike or to instruct the jury to disregard a statement made by Monsanto's associate general counsel, Robert Berendt. Berendt stated that Monsanto intended to start a trust fund with any punitive damages that they were awarded in the case

---

27. At one point during McGarity's lengthy offer of proof testimony, an attorney representing one of the appellants asked McGarity if he had an opinion as to whether the lawyers representing Farm & Home acted reasonably. McGarity responded that he did have an opinion and that he thought the actions were reasonable. This rather broad statement, which was not specifically or necessarily tied to the statutory violations issue, does not in itself suggest that the alleged violations discussed in the documents reviewed by McGarity were relevant to the *Slaughter* plaintiffs' case.

to help clean up the environment. The appellants contend that this statement was inherently prejudicial because it cast Monsanto in a good light and suggested to the jury that the higher the punitive damages award, the greater the aid for the environment.

■ Monsanto responds that the trial court properly refused to strike the cross-examination testimony of Robert Berendt because that testimony was invited by appellants' counsel's questions on cross-examination. *See Evans v. Covington*, 795 S.W.2d 806, 808–09 (Tex.App.—Texarkana 1990, no writ). Counsel for the appellants opened this issue when he urged the jury during opening argument not to enrich Monsanto's lawyers or its corporate treasury. Counsel further opened the door by questioning Berendt regarding what percentage of a punitive damages award would go to the attorneys representing Monsanto and characterizing it as a jackpot for contingency-fee lawyers. A party may not complain about the admission of incompetent evidence which that party brought out and which related to an issue that party first injected into the case. *Pouncy v. Garner*, 626 S.W.2d 337, 340 (Tex.App.—Tyler 1981, writ ref'd n.r.e.). The appellants injected into the record the question of where a recovery of punitive damages might go. Because the complained-of evidence was in response to an area opened by the appellants, we find that the trial court did not err in failing to exclude this evidence. These points of error are overruled.

### Limiting Redirect Examination

■ The appellants complain that Monsanto was allowed to cross-examine counsel Waldeck regarding positions taken by Farm & Home in the *Slaughter* case that were inconsistent with positions taken by Farm & Home in other Brio Site cases, but the trial court did not allow the appellants to question Waldeck regarding positions taken in the *Slaughter* case that were consistent with positions taken in other Brio Site cases. In other words, the appellants contend that the trial court prevented them from rehabilitating their own witness after Monsanto's attempted impeachment.

Monsanto counters that the trial court properly limited the redirect examination of Waldeck because the redirect examination exceeded the scope of Monsanto's cross-examination and sought to elicit inadmissible evidence. On redirect, appellants' counsel attempted to ask Waldeck about evidence from the claims manual that supported Farm & Home's cross-claims against Monsanto in the *Slaughter* case.

■ Texas trial judges have allowed somewhat complete freedom to examining counsel to bring out new matters on redirect, subject to a recross. 1 ROY R. RAY, TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL § 622 (Texas Practice 1980). Texas Rule of Civil Evidence 611(b) provides that a witness may be cross-examined on any matter relevant to any issue in the case, including credibility. The rules, however, are silent on the matter of redirect and recross-examination. Pre–Rules practice provided that an attorney could.conduct a redirect examination of his or her witness to address matters raised on cross-examination. *Allen v. Compton*, 461 S.W.2d 143 (Tex.Civ.App.—Dallas 1970, no writ). The trial judge, nevertheless, has broad discretion in determining whether to permit recross-examination. The trial court is to exercise its reasonable control (TEX.R.CIV.EVID. 611(a)) to make sure the trial flows smoothly and effectively and to avoid unnecessary delay and unfair treatment of the witness. HULEN D. WENDORF, DAVID A. SCHLUETER, & ROBERT BARTON, TEXAS RULES OF EVIDENCE MANUAL VI–66 (3rd ed. 1991). We find that no abuse of discretion was shown in not allowing additional redirect. These points of error are overruled.

### JOINT VENTURES AND DISREGARDING THE CORPORATE IDENTITIES

### Pleadings on the Joint Venture

■ International contends that the trial court erred in submitting Question 8 on joint venture because Monsanto did not properly

plead the issue.[28] In order to properly create a cause of action, a pleading must give fair and adequate notice of the facts upon which the plaintiff bases his action. TEX. R.CIV.P. 47; *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). A proper pleading must enable one to ascertain with reasonable certainty the elements of the plaintiff's cause of action and the relief sought. *Stoner v. Thompson,* 578 S.W.2d 679, 683 (Tex.1979).

Monsanto filed its third amended petition on June 20, 1991; the defendants filed special exceptions to the joint venture allegation on October 11, 1991. The trial court overruled the special exceptions and also denied the defendants' request for additional discovery on the joint venture issue.

In its third amended petition, Monsanto alleged that the defendants' conduct in the *Slaughter* case constituted a joint venture. This petition, filed after the close of fact discovery, states:

> Furthermore, pursuant to the reinsurance participation agreement among the Defendants, the Missouri Settlement Agreement and the Mary Carter Agreements, the Defendants formed a joint venture or partnership and, pursuant thereto, engaged in the joint prosecution of the claims of the plaintiffs in the Slaughter Suit for their mutual profit in violation of the law.

International contends that Monsanto failed to plead any of the facts necessary to prove the essential elements of joint venture and that the agreements listed by Monsanto in its pleading as constituting the joint venture agreement cannot supply the necessary factual predicate for a joint venture allegation. International points out that none of the defendants was an actual party to any of the *Slaughter* Mary Carter agreements, International was not a party to the Missouri settlement agreement, Commonwealth Lloyd's was not a party to the reinsurance participation agreement, and Crum & Forster was not a party to any of those agreements. International concludes that Monsanto's pleadings failed to give it or any of the other defendants proper notice that they were alleged to be participants in a joint venture.

We agree with Monsanto that its joint venture allegation contains sufficient facts to put the defendants on notice as to the basis of the allegation when it is viewed in light of Monsanto's earlier pleadings and the other facts alleged in the third amended petition. Furthermore, the participants in the alleged joint venture were sufficiently defined in the pleading by the term *defendants* because it was inclusive of all the parties named as defendants. The term *defendants* in a pleading should be interpreted to mean all the defendants in the suit unless the context shows otherwise. While it is true that the use of the term *defendants* in the introductory phrase does not refer to all of the defendants in this suit, this does not negate the remaining language which states that the defendants engaged in the joint prosecution of claims against the plaintiffs in the *Slaughter* suit.

There is no requirement that all of the defendants be parties to all of the written agreements in order to form a joint venture; rather, the participation, activities, and objectives of the parties working together may be looked to in determining whether there is a joint venture. While none of the defendants was a named party to the Mary Carter agreements, all would potentially profit by the agreements. In the absence of a timely objection, these allegations suffice to inform the defendants of Monsanto's contentions.

From the time of the filing of the first amended original petition, the other appellants were put on notice that Monsanto was alleging that they had acted jointly in manipulating the *Slaughter* litigation to their advantage. The allegation of a joint venture in its third amended petition presented an additional legal theory based upon the same facts used to support the theories of agency, action and concert, and conspiracy, each of which Monsanto had alleged in earlier petitions. Pleadings are not required to detail the evidence of the case. Looking to all of the

---

**28.** Question 8 asked the jury: "Do you find that the Defendants' conduct, if any, related to the *Slaughter* litigation was in furtherance of a joint venture between the Defendants to engage in the business of insurance?" The jury answered "yes."

allegations, the pleadings indicated and gave fair notice to the appellants that the undertaking in the *Slaughter* case was the joint venture in question in this litigation. These points of error are overruled.

**Discovery on the Joint Venture**

■ The appellants further contend that the trial court erred in denying the request for additional discovery because the joint venture allegation came after the close of discovery, and thus, they were unable to properly prepare a defense. Monsanto responds that appellants' failure to show any specific instance in which they were surprised by evidence introduced by Monsanto on the joint venture issue or were deprived of the opportunity to present evidence which they could have discovered had the trial court not denied discovery on this issue means that appellants waived any error. *See Roche v. E.F. Hutton & Co.*, 658 F.Supp. 315, 319–20 (M.D.Pa.1986), *aff'd*, 862 F.2d 310 (3d Cir.1988). Furthermore, Monsanto suggests that because the joint venture allegation was based on activity that occurred solely among the defendants themselves, Monsanto possessed nothing which could have been of any use to the appellants in preparing a defense. This last contention, however, ignores the fact that discovery often seeks clarification of the fact basis of the plaintiffs' allegations.

■ The scope of discovery is largely a matter of discretion for the trial court. *Gulf Coast Regional Blood Center v. Houston*, 745 S.W.2d 557, 560 (Tex.App.—Fort Worth 1988, orig. proceeding). Because the appellants have not demonstrated any specific area of discovery on joint venture that would have benefited them in this suit and because the appellants waited nearly four months after the joint venture allegation was filed and less than a month before trial to except to these pleadings, the court did not abuse its discretion in not allowing further discovery. These points of error are overruled.

**Incorrect Statements of Law**

■ International contends that jury Question 8 contains incorrect statements of the law. A jury charge is improper if it does not instruct the jury as to the correct law applicable to the facts. *Gulf Coast State*

*Bank v. Emenhiser*, 562 S.W.2d 449, 453 (Tex.1978); *see also Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 628 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

The instructions accompanying Question 8 told the jury:

> A joint venture exists if the parties concerned have an agreement, either express or implied, involving a common interest or purpose, to share profits and losses, with a mutual right to control or management of the enterprise, whether exercised or not.

International contends that the trial court erred in failing to specifically instruct the jury (1) that the defendants must have possessed the intent to form a joint venture, (2) that the agreement must have evidenced an intent to share *net* profits *as principals,* and (3) that a joint venture exists only for a single transaction and is limited in scope and duration.

■ The core element in determining the existence of a joint venture is whether the participants to the agreement intended to form a joint venture. *Gutierrez v. Yancey,* 650 S.W.2d 169, 171 (Tex.App.—San Antonio 1983, no writ). An agreement, however, to share profits and losses with the mutual right of control in itself requires a finding of specific intent, and it is not error to fail to instruct the jury that the defendants must have possessed the intent to form a joint venture. *Gibson v. Northeast National Bank,* 602 S.W.2d 337, 340–41 (Tex.Civ. App.—Fort Worth 1980, writ ref'd n.r.e.).

■ International's contention that the trial court erred in omitting the terms "net profits" and "as principals" from its joint venture instruction apparently stems from some courts having defined joint venture using those terms. *See, e.g., Taylor v. GWR Operating Co.,* 820 S.W.2d 908, 911 (Tex. App.—Houston [1st Dist.] 1991, writ denied); *Carlyle Joint Venture v. H.B. Zachry Co.,* 802 S.W.2d 814, 816 n. 2 (Tex.App.—San Antonio 1990, writ denied); *Gray v. West,* 608 S.W.2d 771, 776 (Tex.Civ.App.—Amarillo 1980, writ ref'd n.r.e.). Other cases, however, have omitted those terms in defining the requisite elements of joint venture. *See, e.g., Dunbar v. RKG Engineering,* 746 S.W.2d

314, 315 (Tex.App.—Texarkana 1988, no writ); *R.L. Lipsey, Inc. v. Panama–Williams, Inc.,* 611 S.W.2d 917, 920 (Tex.Civ. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.). These terms are not essential to the jury instruction. We find that the instruction "to share profits and losses" was sufficient to cover that element.

The appellants contend that a joint venture exists only for a single transaction and is limited in scope and duration and that the trial court erred in not instructing the jury as to this component, citing *Harrington v. Harrington,* 742 S.W.2d 722 (Tex.App.—Houston [1st Dist.] 1987, no writ). In *Harrington,* the court distinguished joint ventures from partnerships by stating that they are similar but a joint venture "is generally limited to a single transaction." *Id.* at 724. In *Brown v. Cole,* 155 Tex. 624, 291 S.W.2d 704 (1956), the Court stated that participants in a joint venture are engaged in the joint prosecution of a particular or singular transaction for mutual benefit or profit. The charge in the present case spoke to the "control or management of *the enterprise.*" This language suggests a particular or singular transaction and, in the context of the damages sought in the present case, the jury was aware that the singular transaction was the *Slaughter* litigation.

Trial courts have great discretion in submitting definitional instructions in the jury charge. The record does not reflect that any of the appellants submitted a proposed instruction containing any of the missing elements about which they complain. The only objection made to the definition which is complained about on appeal is the failure of the definition to contain a specific instruction on intent, which we have found not to be necessary. We find that the trial court did not abuse its discretion in submitting this instruction. These points of error are overruled.

### Sufficiency of the Evidence to Support a Joint Venture

The appellants have challenged the sufficiency of the evidence to support the jury finding of joint venture. There is evidence that the method of sharing profits and expenses by the appellants was set up for the transaction of the general business of insurance. Under a reinsurance participation agreement, or inter-company pooling arrangement, profits and losses were shared by five of Crum & Forster's largest subsidiaries, including United States Fire, North River, and International, based on fixed percentages. An insurance industry expert testified that Commonwealth Lloyd's indirectly participated in the pooling arrangement because International reinsured 100% of Commonwealth Lloyd's business and International received all of its premiums under a separate reinsurance agreement; thus, its involvement paralleled International's involvement in the pooling agreement. Crum & Forster owned all the stock in the companies and, thus, ultimately profited or lost in accordance with what these companies did. This, however, is not the type of arrangement—nor does it constitute the type of agreement necessary to establish a joint venture. There is no evidence, therefore, to establish that Crum & Forster entered into an agreement to share profits and losses in this venture. The involvement of Crum & Forster is addressed under "Disregarding the Corporate Identities."

The pooling agreement was a sharing built into the financial arrangements for all of the appellants' insurance business across the country. It was not set up for or in any way limited to the *Slaughter* litigation. As a matter of fact, it was set up over ten years before the takeover of the *Slaughter* litigation. There are numerous Texas cases stating that a joint venture is generally limited to prosecuting a particular transaction or to one particular enterprise. *Lawler v. Dallas Statler–Hilton Joint Venture,* 793 S.W.2d 27 (Tex.App.—Dallas 1990, writ denied); *Russell v. French & Associates,* 709 S.W.2d 312 (Tex.App.—Texarkana 1986, writ ref'd n.r.e.).

A partnership is usually formed for the transaction of a continuing general business. *Tex–Co Grain Co. v. Happy Wheat Growers, Inc.,* 542 S.W.2d 934 (Tex. Civ.App.—Amarillo 1976, no writ). The rights, duties, and liabilities of joint venturers are analogous to those of partners.

*Woodrum v. Cowan,* 468 S.W.2d 592, 598–99 (Tex.Civ.App.—Austin), *modified,* 472 S.W.2d 749 (Tex.1971). The admission of a partnership implies all of the elements of the existence of a joint venture. *Alstan Corp. v. Board of Admin. of Chimney Corners,* 713 S.W.2d 130 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Therefore, evidence establishing a partnership instead of a joint venture still shows the essential elements of a joint venture and results in the same liability.

■ The four essential elements of a joint venture are community of interest in the venture, agreement to share profits, agreement to share losses, and mutual right of control or management of the enterprise. *Trailways, Inc. v. Clark,* 794 S.W.2d 479 (Tex.App.—Corpus Christi 1990, writ denied). We find no cases negating a joint venture because the parties have had the same arrangement in general business and continued to operate with that arrangement on the joint venture. Furthermore, we find no cases in which a court held that whether the venture is limited to a single transaction or enterprise is an essential element of the joint venture.

While it is true that only two of the appellants were named insurers of Monsanto, all of the other appellants stood to profit on a proportional basis from the insurance premiums to the same extent as they would if they had been the named insurer and could suffer potential losses the same as if they had been the named insurer.

The reinsurance participation agreement contains ample evidence that all of the appellants except Commonwealth Lloyd's and Crum & Forster shared profits and expenses. Commonwealth Lloyd's participated with International, through a separate agreement, and it was a signatory to the Missouri settlement agreement. This sharing resulted from their agreement and gave them a community of interest in the *Slaughter* litigation. The agreement shows that the parties had a mutual right of control or management, although in this transaction it was to some extent delegated to Crum & Forster to control the litigation.

We find that there was factually and legally sufficient evidence to support each of the required elements of joint venture for all the appellants except Crum & Forster. We find no evidence to establish an agreement between Crum & Forster and the other appellants to share profits and losses. These points of error are overruled, except as to the point of error by Crum & Forster, which is sustained.

**Disregarding the Corporate Identities**

■ Question 9 asked the jury whether the distinct corporate identities of the defendants should be disregarded.[29] The instruction accompanying Question 9 informed the jury that

> The distinct corporate identities of corporations are to be disregarded, even though corporate formalities have been observed, where the corporate form is used as a means of evading a legal duty, or is relied upon to justify a wrong, if recognizing the separate corporate identities would result in inequity or injustice to Monsanto.

The appellants contend that the trial court erred in refusing to instruct the jury that before the corporate veil can be pierced there must be a finding of wrongdoing on the part of the person to be held liable and in refusing to instruct the jury to consider all of the facts and the consequences that will result from its answer. A trial court has considerable discretion in deciding whether definitions and instructions are necessary and proper. *Eoff v. Hal and Charlie Peterson Foundation,* 811 S.W.2d 187, 192 (Tex. App.—San Antonio 1991, no writ); *see also, Houston Nat. Bank v. Biber,* 613 S.W.2d 771, 776 (Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) (trial court has considerably more discretion in submitting instructions than in submitting special questions).

---

**29.** "QUESTION 9: In connection with the Defendants' conduct, if any, related to the *Slaughter* litigation, do you find that the distinct corporate identities of Defendants United States Fire Insurance Company, International Insurance Company, North River Insurance Company, Commonwealth Lloyds Insurance Company, and Crum & Forster, Inc., should be disregarded?" Answer "Yes" or "No". ANSWER: Yes

The appellants have cited to no case, and we have found none, that requires a jury instruction on either a wrongdoing requirement or on considering all of the facts and circumstances. Furthermore, the instruction given by the trial court did inform the jury that in order to disregard the corporate identities of the appellants they would have to find that the corporate form was used either as a means of evading a legal duty or to justify a wrong. An affirmative finding on either alternative would constitute a finding of wrongful conduct. Therefore, an additional instruction regarding wrongful conduct would be superfluous. The trial court did not err in omitting the instructions.

■ The appellants next contend that there was no evidence to support the jury's finding that the corporate identities should be disregarded. The appellants take the position that fraud is a prerequisite to disregarding the corporate identity. As the Supreme Court said in *Matthews Construction, Inc. v. Rosen,* 796 S.W.2d 692 (Tex.1990), "[w]hen the corporate form is used as an essentially unfair device—when it is used as a sham—courts may act in equity and disregard the usual rules of law in order to avoid an inequitable result." [30]

■ In 1989, the Legislature amended Article 2.21 of the Business Corporation Act to eliminate constructive fraud and failure to observe corporate formalities as vehicles for establishing shareholder liability for corporate acts in connection with contract claims. An exception is by showing actual or common-law fraud. This section is to be applied retroactively to a fact situation and cause of action that arose before the effective date of such amendments because the various doctrines for piercing the corporate veil do not create substantive causes of action but are purely remedial. *Farr v. Sun World Sav. Assoc.,* 810 S.W.2d 294 (Tex.App.—El Paso 1991, no writ).

The specific language of Article 2.21 deals with obligations to the corporation or to its obligees. The term *obligee* is generally defined as "the person in favor of whom some obligation is contracted." BLACK'S LAW DICTIONARY 1066 (6th ed. 1990). This is consistent with Subsection (A)(2), which limits the applicability of this amendment to "any contractual obligation." Article 2.21(B) states that the stockholder's liability is limited by Section (A) of the Act, which is exclusive and preempts any other liability imposed upon a stockholder "for that obligation under common law or otherwise." The term *for that obligation* refers back to Section (A) which states "any contractual obligation." Thus, this amendment did not preclude liability in situations in which the liability is based upon something other than a contractual obligation.

■ Corporate fiction can be disregarded, even though corporate formalities have been observed and corporate and individual property have been kept separate, when corporate form has been used as part of a basically unfair device to achieve an inequitable result. *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex.1986). Texas recognizes six situations in which the corporate fiction will be disregarded:

(1) where the fiction is used as a means of perpetrating fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation [alter ego];

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation [covered in jury Question 9];

(4) where the corporate fiction is employed to achieve or perpetrate a monopoly;

(5) where the corporate fiction is used to circumvent a statute; and

(6) where the corporate fiction is relied upon as a protection of crime or to

---

**30.** The Court cites BALLENTINE ON CORPORATIONS, § 122 (rev. 1946), saying,

The use of the entity privilege of separate capacities is at all times subject to limitations of an equitable nature to prevent the privilege from being exercised or asserted for illegal, fraudulent or unfair purposes by those claiming under it, and courts of law and equity will interpose to prevent its abuse *as the situation may require.*

justify wrong [covered in jury Question 9].

*Castleberry v. Branscum,* 721 S.W.2d at 272.

Of the specific reasons set forth for disregarding the corporate fiction, the jury instruction covered the use of the corporate fiction as a means of evading an existing legal obligation and the use of the corporate fiction to justify a wrong. This does not mean, however, that the fact that the appellants functioned in many ways as a single integrated business unit did not play a role in the two specific areas of complaint. Crum & Forster itself owns 100% of the stock of United States Fire, International, and North River, and another wholly-owned subsidiary of Crum & Forster owns 100% of the stock of Commonwealth Lloyd's. Also, International reinsures 100% of Commonwealth Lloyd's business. As a holding company, Crum & Forster operates through a series of "profit centers" which carry out the functions of an insurance company, selling policies issued by each of the insurance companies owned by Crum & Forster and handling all of the claims on these policies.

■ In a magazine advertisement admitted into evidence, the reader is asked to "choose quality property and casualty insurance from Crum & Forster." None of the insurance companies whose stock was owned by Crum & Forster employed separate employees, but all instead utilized the profit centers of Crum & Forster. The companies operated based on an inter-company pooling arrangement under which profits and losses were shared, based on a fixed percentage, by the five largest subsidiaries. The profit centers used letterheads, checks, and drafts styled "The Crum & Forster Organization" regardless of the identity of the individual insurance carrier for which the task was being performed. The forms used by the companies are all the same and someone chooses a box to check to show which company under the Crum & Forster logo is to be involved.[31] While it is true that all of the appellants, except Commonwealth Lloyd's, are separately incorporated, their directors and officers significantly overlap. All of their claims are paid out of one banking account, and a consolidated tax return is filed. A court may consider common employees, common offices, centralized accounting, payment by one corporation of the wages of the other corporation's employees, common business name, and services rendered by employees of one corporation on behalf of the other corporation in determining whether the corporations have been maintained as separate entities. *Superior Derrick Services v. Anderson,* 831 S.W.2d 868 (Tex.App.—Houston [14th Dist.] 1992, writ denied). Corporations can become jointly and severally liable when they integrate their resources to achieve common business purposes. *Id.* The evidence supports the conclusion that Crum & Forster and its subsidiary insurance companies were operated as a single entity.

■ We must next examine the evidence to determine whether the appellants used their separate corporate identities as a means of evading a legal duty or to justify a wrong. The appellants contend that the trial court improperly used the piercing of the corporate veil to create a cause of action. An attempt to pierce the corporate veil, in and of itself, is not a cause of action, but rather it is a means of imposing liability on an underlying cause of action. *Gallagher v. Bintliff,* 740 S.W.2d 118 (Tex.App.—Austin 1987, writ denied). The evidence reflects that United States Fire, North River, and Commonwealth Lloyd's took advantage of their positions as insurers of Farm & Home to try to recoup money from Monsanto in an unethical role that violates public policy. These three companies owed a duty to Monsanto not to try to obtain a financial gain as a joint tortfeasor. *See International Proteins Corp. v. Ralston–Purina Co.,* 744 S.W.2d 932; *Beech Aircraft Corp. v. Jinkins,* 739 S.W.2d 19.

---

**31.** This is the letterhead used by the corporations:

☑ UNITED STATES FIRE INSURANCE COMPANY
☐ THE NORTH RIVER INSURANCE COMPANY
☐ WESTCHESTER FIRE INSURANCE COMPANY
☐ INTERNATIONAL INSURANCE COMPANY
**CRUM & FORSTER INSURANCE COMPANIES**

This duty comes in the form of a prohibition based upon public policy which inures to the benefit of all parties alleged to be joint tortfeasors. In *Hickman v. Rawls*, 638 S.W.2d 100 (Tex.App.—Dallas 1982, writ ref'd n.r.e.), the court found that one of the reasons there was no liability was because there was no evidence to suggest that the corporate identity was used against public policy. The converse of that is true in the present case. It was wrong for International and United States Fire to participate against Monsanto in the lawsuit in which they had potential insurance coverage. (See section "An Insured Party?") It is easy to see that this conflict could result in the manipulation of the lawsuit in such a way as to make any liability outside of International's coverage. Monsanto offered evidence to show that, after the appellants took charge of the lawsuit, the pleadings were amended to seek damages primarily on the basis of statutory violations. Statutory violations were not excluded under International's insurance coverage of Monsanto.

Although International was not an insurer of Farm & Home, it was involved in an interlocking agreement with the other three companies by which it would profit if its insured Monsanto had been found liable. Although Crum & Forster was not in the business of issuing insurance policies, as the holder of all the stock in these companies its ultimate profit came from premiums collected by its subsidiaries from insurance policies, and it cannot be heard to say that it was in no way involved in the insurance industry.

■ Crum & Forster cannot hide behind the Insurance Holding Company System Regulatory Act (TEX.INS.CODE ANN. art. 21.49–1 (Vernon 1981 & Supp.1994)) to insulate it from liability when it undertook to control the legal action against Monsanto under the guise of Farm & Home because such action violated the Act by being detrimental to Monsanto as a policyholder of International and United States Fire. Article 21.49–1 permits conduct "consistent with the public interest." Conduct is declared to be adverse to public interest when such control is adverse to the interest of policyholders. This obviously does not refer to the policyholders of the holding company, because it had no policyholders. Therefore, it must mean the policyholders of the subsidiaries of the holding company. Crum & Forster, through the manipulation of the *Slaughter* litigation, attempted to adversely affect the interest of Monsanto as a policyholder.

The Crum & Forster subsidiaries are no more than conduits through which Crum & Forster conducts business. Each company is willing to assert its lack of involvement with Monsanto by pointing to the corporate maze. Yet, an examination of the operation of the companies shows that they all mutually gained or lost by the actions of employees acting on behalf of all the companies.

■ Because disregarding the corporate fiction is an equitable doctrine, Texas takes an equitable fact-specific approach. *Castleberry v. Branscum*, 721 S.W.2d 270. The court should look beyond the corporate forms to the realities of the relationship between the corporations in order to determine whether their affairs are so commingled as to constitute one integrated business enterprise. *Castleberry v. Branscum*, 721 S.W.2d at 275; *Seaside Industries v. Cooper*, 766 S.W.2d 566, 569 (Tex.App.—Dallas 1989, no writ). When companies are willing to accept gain from other interlocking companies, but attempt to insulate themselves from liability through their corporate structure, the corporate identities may be pierced vertically, as well as horizontally, to prevent an evasion of an existing legal obligation or the use of the corporation fiction to justify a wrong. The interwoven identity of interest of these corporations and the method of operation makes all of the companies responsible to Monsanto under the Insurance Code. We find that there was sufficient evidence, factually and legally, upon which the jury could make a finding that the appellants used their separate corporate identities to evade a legal duty or to justify a wrong and, therefore, the separate identities should be disregarded. These points of error are overruled.

### Commonwealth Lloyd's Plan

■ The appellants also contend that Commonwealth Lloyd's could not be subject to the piercing of the corporate veil because

Commonwealth Lloyd's is not a corporation. Commonwealth Lloyd's is not a corporation but is controlled by its underwriters and maintains its own directors, officers, bylaws, books and records, and assets and liabilities. Commonwealth Lloyd's is set up under the Lloyd's plan, TEX.INS.CODE ANN. arts. 18.01–18.24 (Vernon 1981 & Supp.1994). Under this plan, individuals, partnerships, or associations of individuals are authorized to write any insurance, except life insurance, by executing articles of agreement expressing their purpose to do so and complying with the requirements set forth in the Insurance Code for this type of business. The plan provides for limitation of liability of the underwriters, and the companies operating under the Lloyd's plan have many of the characteristics of a corporation. As the court said in *Garner v. Jones*, 81 S.W.2d 536 (Tex.Civ.App.—El Paso 1935, writ dism'd), such organizations have a legal status that is more in the nature of corporate entities and should be regarded as insurance corporations, *citing In re Lloyds of Texas*, 43 F.2d 383 (N.D.Tex. 1930). These points of error are overruled.

### Obligation or Duty

 The appellants also contend that Question 9 contains an incorrect statement of the law because the terms *obligation* and *duty* are not interchangeable in this context. International suggests that the rationale of evasion of a legal duty is limited to legal obligations, such as obligations under a contract, and, therefore, should not be used to pierce a corporate veil when it is a more general form of duty, such as the duty of care, which has been evaded. International, however, cites to no case that expressly states that it is error for a court to instruct a jury on a sham to perpetrate a fraud using the term *legal duty* rather than the term *legal obligation*. The general tone of the *Castleberry* opinion, with its discussion of the importance of equity in disregarding the corporate fiction, suggests that such nice distinctions are not to be favored. In fact, a treatise cited by the court in *Castleberry* defines the doctrine of corporate disregard as "prevention of evasion of law or legal *obligation or duty*" (emphasis added). 1 W. FLETCHER, CYCLOPEDIA CORPORATIONS § 45,

at 820 (1990). These points of error are overruled.

### No Irreconcilable Conflict

 The appellants contend that the jury's answers finding a joint venture and disregarding the corporate identities are in irreconcilable conflict. In determining whether an irreconcilable conflict exists between two jury findings, the test is whether there is any reasonable basis upon which they may be reconciled. *Bender v. Southern Pacific Transp. Co.*, 600 S.W.2d 257, 260 (Tex.1980). The appellants argue that a joint venture by definition involves two or more separate parties and is inconsistent with the corporation functioning as a single entity. We disagree. A joint venture can designate one of the venturers to conduct and manage the business of the joint venture. *Milberg Factors v. Hurwitz–Nordlicht Joint Venture*, 676 S.W.2d 613 (Tex.App.—Austin 1984, writ ref'd n.r.e.). Furthermore, a joint venture is essentially a partnership set up for a single transaction. *Kartalis v. Commander Warehouse Joint Venture*, 773 S.W.2d 393 (Tex. App.—Dallas 1989, no writ). A partnership functions as an entity and is recognized as such under Texas law. The finding on disregarding the corporate entities essentially means that these corporations have come together to function as one entity as a partnership would. Both concepts entail working together as a single entity. These two jury findings are not in irreconcilable conflict. These points of error are overruled.

### Vagueness and Out-of-Context Use of the Jury Answers

 The appellants contend that the trial court erred in forming a judgment that takes Questions 8 and 9 out of context. They contend that the questions were divided into clusters: Questions 1 through 4 inquiring about allegations of misrepresentation and improper claim handling by International; Questions 5 through 12 inquiring into the alleged violations by three companies insuring Farm & Home; and Questions 8 through 14 inquiring into allegations of the breach of the duty of good faith and fair dealing by all of the defendants.

Question 5 specifically concerns only the three insurance companies that insured Farm & Home. (The question specifically names defendants United States Fire, Commonwealth Lloyd's, and North River.) Question 6 continues to apply only to those named insurance companies because it is conditioned upon answering "yes" to any of the subparts of Question 5, and it inquires about the sum of money due Monsanto "from such deceptive acts or practices which you have found *such Defendants* committed in Question # 5" (emphasis added). Question 7 is also conditioned upon the finding of "yes" to a subpart of Question 5 and clearly refers to "such Defendants." The language, *such Defendants,* applies only to the three defendants specifically named in Question 5.

Question 8 does not refer to "such Defendants," but refers only to "the Defendants' conduct." This question is not conditioned upon the answers to any of the foregoing questions, and the term *defendants* must refer to all the defendants in the litigation. Question 9 again refers to "the Defendants' conduct" and then names all five of the defendants in the litigation. This obviously refers to all of the defendants. Question 10 is conditioned upon a "yes" answer to Questions 8 or 9, and the following questions are conditioned on the questions in the cluster that comes after Question 9.

The jury is instructed not to consider the effects of the answers to the questions; therefore, the only consideration the jury can give to the conditioning language is whether or not to answer the following question which is dependent upon the answer to a preceding question. The conduct inquired into in Questions 8 and 9 was limited by the term "related to the *Slaughter* litigation." In determining the question of joint venture and the disregarding of the corporate structure, the jury was not limited to considering only the alleged wrongful conduct which caused Mon-

santo damages, but rather the jury was entitled to consider all of the appellants' conduct in connection with the *Slaughter* litigation.

 The appellants contend that the trial court took Questions 8 and 9 out of context because they belonged only with the last cluster and should not have been used in conjunction with Question 5. International correctly points out that the trial court said, "Five doesn't have any liability for International." The trial court initially denied International any right to devote any part of its final argument to Question 5. The trial court again said, "I don't think that that (sic) No. 9 impacts on the liability of International at all." Then counsel for Monsanto stated that he was not going to ask the court to form a judgment against International based on jury Question 9.

The appellants contend that Monsanto cannot now receive a judgment against International based on Question 9 after counsel for Monsanto stated that he was not going to ask for a judgment to be formed upon that basis. As this Court learned from *American National Petroleum v. Transcontinental Gas Pipe Line,* the trial court was entitled to rely on the statement of counsel and hold the party to its position. *American Nat'l Petro. v. Transcontinental Gas Pipe Line Corp.,* 798 S.W.2d 274 (Tex.1990) (*reversing,* 763 S.W.2d 809 (Tex.App.—Texarkana 1988)); *see also Johnson v. Swain,* 787 S.W.2d 36, 39 (Tex.1989).

This, however, was not the end of the bench discussion. Later in this discussion, Monsanto's counsel stated that International could be vicariously liable under Questions 8 and 9.[32] The trial court made it clear that it did not want to hear the same arguments during the four hours allotted each side.[33] The trial court ultimately conceded that International could argue the case as the

---

**32.** International concedes that one co-venturer may be held vicariously liable for the wrongful conduct of another co-venturer, if such wrongful conduct was within the scope of the joint venture in issue, citing *Otis Elevator v. Zac Smith & Co.,* 715 S.W.2d 806, 808 (Tex.App.—Austin 1986), *aff'd,* 734 S.W.2d 662 (Tex.1987), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 986 (1988).

**33.** The court: "Well, I'm just telling you if it ends up being like I think it's going to be, I'm going to call you up here and may just stop it because what you're doing is just having everybody get up and argue the same thing; and I don't think that's right."

charge applied to International. No objections were made at that point by any of the appellants. Thus, it was understood that International could be held liable under an affirmative finding on Questions 8 and 9. These points of error are overruled.

### DUE PROCESS

 Crum & Forster and International contend that the entry of judgment against them, holding them jointly and severally liable for punitive damages, is contrary to Texas law and violates their due process rights. Damages awarded under Article 21.21, Section 16 of the Texas Insurance Code constitute punitive damages. *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 9 (Tex.1991). Under the Insurance Code, a finding that a defendant knowingly violated the Insurance Code is a prerequisite to the imposition of treble damages. TEX.INS.CODE ANN. art. 21.21, §§ 2(c), 16(b)(1) (Vernon Supp.1994). Crum & Forster therefore contends that because the judgment was not based on any finding that Crum & Forster itself violated the Insurance Code at all, much less knowingly, the judgment stands against the dictates of the Insurance Code and constitutes a violation of Crum & Forster's due process rights under the United States and Texas Constitutions. U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19; *Jordan v. De George,* 341 U.S. 223, 71 S.Ct. 703, 95 L.Ed. 886 (1951); *Texas Liquor Control Board v. Attic Club, Inc.,* 457 S.W.2d 41, 45 (Tex. 1970); *State v. Shoppers World, Inc.,* 380 S.W.2d 107, 111–12 (Tex.1964). We have discussed under "Sufficiency of the Evidence to Support the Findings of Knowing Conduct" the reasons that the appellants should have been aware that such conduct was improper under the laws of the State.

 Crum & Forster additionally contends that the imposition of punitive damages against it violates due process because the damages are based solely on vicarious liability and not on any finding that Crum & Forster itself engaged in any wrongdoing. Actually, the evidence shows that it was Crum & Forster who pulled the strings to manipulate the acts upon which this litigation is based. While it is true that "such Defen-

dants," referred to in the Question 7 finding that the conduct was knowingly done, refers to the three insurers specifically mentioned in Question 5 (United States Fire Insurance, Commonwealth Lloyd's Insurance Company, North River Insurance Company), Question 8 established that the parties engaged in a joint venture, which would result in the same liability as a partnership. Partners can be vicariously liable for the conduct of other partners. *See* TEX.REV.CIV.STAT.ANN. art. 6132b, § 13 (Vernon 1970). Furthermore, under the finding of jury Question 9 and the evidence offered in support of that answer, the corporate identities are to be disregarded and all of the entities participating in the action are liable.

Crum & Forster cites two cases in which the United States Supreme Court held that the imposition of punitive damages which does not serve to punish or to deter wrongful conduct or which is greater than reasonably necessary to punish and deter that conduct is unconstitutional as violative of due process. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991); *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

In the *Haslip* case, the United States Supreme Court held that punitive damage awards do not violate the due process provision of the Fourteenth Amendment when the award is based on an objective criterion. The Supreme Court conceded that unlimited jury or judicial discretion and the fixing of punitive damages may invite extreme results that are unacceptable under the due process clause. Therefore, the general concerns of reasonableness and adequate guidance from the court must be considered in determining whether punitive damages are unconstitutional. *Fibreboard Corp. v. Pool,* 813 S.W.2d at 686. In the present case, the punitive damages were limited to the doubling of the actual damages in the case. We conclude that this fulfills the objective criterion, and thus, the due process provision of the Fourteenth Amendment was not violated. Furthermore, we find that the imposition of punitive damages in this case is not in excess of what is required to reasonably serve to pun-

ish or deter wrongful conduct. These points of error are overruled.

### ATTORNEYS' FEES IN PRESENT SUIT

■ The appellants contend that the trial court erred in calculating attorneys' fees and thus effectively awarded additional penalty damages which are not authorized by the Texas Insurance Code. Prior to the judgment, the parties stipulated that a reasonable fee for Monsanto's attorneys in this case was $7.2 million, plus fifteen percent of the amount to which attorneys' fees were applicable, as determined by the court.

The appellants contend that the Insurance Code itself limits the calculation of contingency attorneys' fees to include only actual damages before trebling occurs. Under Article 21.21 of the Texas Insurance Code, a prevailing plaintiff is entitled to the following:

> [T]he amount of actual damages plus court costs and reasonable and necessary attorneys' fees. If the trier of fact finds that the defendant knowingly committed the acts complained of, the court shall award, in addition, two times the amount of actual damages.

Tex.Ins.Code Ann. art. 21.21, § 16(b)(1) (Vernon Supp.1994). Article 21.21 speaks of actual damages and attorneys' fees as two separate items and then only provides for an additional doubling of actual damages. This language does not refer to the method of calculating attorneys' fees, but rather refers to the punitive amount to be awarded if the acts are committed knowingly—this being two times the amount of actual damages.

Monsanto contends that the appellants are bound not to contest the reasonableness of the attorneys' fees because of the stipulation that the parties entered into. *See Perry v. Brooks*, 808 S.W.2d 227, 229 (Tex.App.—Houston [14th Dist.] 1991, no writ) (stipulations are conclusive as to the stipulated facts). The stipulation included the following provisions:

> 1. 15% of the amounts recovered to which attorney's fees are applicable, as determined by the Court; . . .
>
> . . . .

However, the parties specifically reserve for determination by the Court all questions of law as to whether the Plaintiff is entitled to the recovery of attorney's fees in this action.

■ By the language of the stipulation, the parties carefully left matters of law to the court's determination and essentially recognized that stipulations are conclusive only on matters of fact and not of law. There is no statutory prohibition of a contingency fee based upon the entire recovery, including the punitive amount. Contingency fees can be based on the plaintiff's entire recovery, including punitive damages. *See, e.g., Great American Insurance Co. v. North Austin Municipal Utility*, 850 S.W.2d 285, 291 (Tex. App.—Austin 1993, writ pending). We find no reason that contingency attorneys' fees in the present case should not be based upon the entire recovery as allowed by the trial court. These points of error are overruled.

### PREJUDGMENT INTEREST

The appellants contend that the trial court erred in calculating and trebling prejudgment interest, pointing out that the trial court's final judgment gave Monsanto more money in prejudgment interest ($16 million) than in actual damages ($13 million).

■ The appellants first contend that the trial court erred in awarding prejudgment interest beginning six months after the date that the Mary Carter agreements were signed in the *Slaughter* litigation. In *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549, 555 (Tex.1985), the Texas Supreme Court created a judicial scheme for the award of prejudgment interest in wrongful death and nondeath personal injury cases. This scheme has essentially been expanded to cover all cases that are not covered by statute. *Crown Central Petroleum Corp. v. National Union Fire Ins. Co.*, 768 F.2d 632 (5th Cir.1985). The Court in *Cavnar* allowed interest in situations in which damages were incurred intermittently throughout the prejudgment period. The amount of damages, being the attorneys' fees and court costs, was readily ascertainable in the present case after the litigation, but because of the intermit-

tent nature of the accrual of these fees, the *Cavnar* formula is appropriate for setting the amount of interest. Monsanto began incurring attorneys' fees as a result of the appellants' acts after May 1988, when Crum & Forster, in accordance with an agreement with the *Slaughter* plaintiffs, took over the prosecution of the litigation. Thus, this is an appropriate date to begin the six months running after which prejudgment interest could begin.

■ The appellants also contend that the trial court improperly compounded prejudgment interest daily. There has been a considerable amount of confusion among Texas courts in regard to how prejudgment interest should be compounded in cases following *Cavnar*. *Cavnar* itself mandated daily compounding of prejudgment interest, but it also directed courts to set the rate of interest based on Tex.Rev.Civ.Stat.Ann. art. 5069-1.05, § 2, which provides a formula for determining the rate of post-judgment interest. *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d at 554. In 1987, after the Supreme Court's opinion in *Cavnar* was handed down, the Texas Legislature amended Article 5069-1.05, Section 2 so that it now authorizes annual compounding of post-judgment interest. Some courts have thus allowed for annual compounding of prejudgment interest in cases under *Cavnar* by relying on the change in the Article and the *Cavnar* court's citation to it. *See Enterprise–Laredo v. Hachar's*, 839 S.W.2d 822, 839 (Tex.App.—San Antonio), *per curiam*, 843 S.W.2d 476 (Tex.1992); *see also Winograd v. Willis*, 789 S.W.2d 307, 312 (Tex.App.—Houston [14th Dist.] 1990, writ denied) (court awarded daily compounding under *Cavnar* but stated that it would have awarded annual compounding if suit had been filed after the effective date of the amendment).

Also in 1987, the Legislature added Section 6 to Article 5069-1.05 to require that prejudgment interest be awarded in certain cases, i.e., wrongful death, personal injury, and property damage cases. Section 6 mandates that prejudgment interest in these cases be computed as simple interest. Several courts have read the application of Article 5069-1.05, Section 6 as limited to the three listed types of cases. *See Spangler v. Jones*, 861 S.W.2d 392, 398–99 (Tex.App.—Dallas 1993, writ denied); *Associated Telephone v. Five D's Publishing Co.*, 849 S.W.2d 894, 899–900 (Tex.App.—Austin 1993, no writ); *Enterprise–Laredo*, 839 S.W.2d at 839. At least one court has, in dicta, suggested that Section 6 be read more broadly so as to apply to all prejudgment interest awards. *See Texas Commerce Bank v. Lebco Constructors*, 865 S.W.2d 68, 84 (Tex.App.—Corpus Christi 1993, writ denied).[34] Beyond denying writ on several of the cases cited above, the Texas Supreme Court has thus far declined to speak definitively on this issue.

Finding no completely satisfactory and consistent statutory method of compounding in this type of case and finding difficult sledding through the cases in which appellate courts have sought the answer, we have decided to embrace the analysis given by the Austin Court of Appeals in *Associated Telephone v. Five D's Publishing Co.*, 849 S.W.2d at 899–900. First, *Cavnar* expressly states that prejudgment interest should be compounded daily, and it referred to Article 5069-1.05 only for rate calculation purposes and not for determining the method of compounding interest. 696 S.W.2d at 554. Therefore, there is no statutory or Supreme Court authority for compounding prejudgment interest annually. Second, although it might appear more rational to have one rule regarding compounding prejudgment interest for all cases, the Texas Legislature has mandated that in three particular types of cases, i.e., wrongful death, personal injury, and property damage, prejudgment interest should be calculated as simple interest. *See* Tex.Rev.Civ.Stat.Ann. art. 5069-1.05, § 6

---

**34.** The court in *Texas Commerce Bank v. Lebco Constructors*, 865 S.W.2d 68, 84 n. 13 (Tex. App.—Corpus Christi 1993, writ denied), cited to *O'Reilly v. Grafham*, 797 S.W.2d 399, 401 (Tex. App.—Austin 1990, no writ), in support of its position on Article 5069-1.05, Section 6. But the *O'Reilly* court merely stated that it did not reach the issue of the application of Section 6 because the case had been filed before the effective date of the Section. In *Associated Telephone v. Five D's Publishing Co.*, 849 S.W.2d 894 (Tex. App.—Austin 1993, no writ), the Austin court held that Section 6 was limited in application to the listed types of cases.

(Vernon Supp.1994). Prejudgment interest awards in cases not covered by Section 6 should be computed based on the daily compounding directive in *Cavnar. See Associated Tel. v. Five D's Pub. Co.*, 849 S.W.2d at 899–900.

In the present case, the injury inflicted upon Monsanto, i.e., loss of the cost of defending in the *Slaughter* litigation, was not physical in nature, but economic. The lawsuit before the court, therefore, does not involve property damage, and it certainly does not involve personal injury or wrongful death. *See Associated Tel. v. Five D's Pub. Co.*, 849 S.W.2d at 899–900. Thus, this case is not controlled by Article 5069–1.05, Section 6. *See id. Cavnar* controls the award of prejudgment interest in the present case, and the trial court did not err in ordering prejudgment interest compounded daily. The appellants' point of error is overruled.

■ The appellants next contend that the trial court improperly trebled prejudgment interest. In *Vail*, the Texas Supreme Court refused to award prejudgment interest on damages that had already been trebled. *Vail v. Texas Farm Bureau Mut. Ins. Co.*, 754 S.W.2d 129. In the present case, prejudgment interest was accrued on actual damages and then trebled. The appellants contend that the Texas Supreme Court's prohibition against interest on additional damages limits trebling under the Insurance Code to those elements of actual damages resulting from statutory violations. The appellants contend that prejudgment interest was not a damage resulting from statutory violations and that it should be excluded from the trebling of damages. Most Texas courts that have addressed this issue have excluded prejudgment interest from the definition of actual damages for purposes of trebling damages under the DTPA and the Insurance Code. *See Group Medical & Surgical Service v. Leong*, 750 S.W.2d 791, 798 (Tex. App.—El Paso 1988, writ denied); *Hope v. Allstate Ins. Co.*, 719 S.W.2d 634, 638 (Tex. App.—Fort Worth 1986, writ ref'd n.r.e.); *Precision Homes, Inc. v. Cooper*, 671 S.W.2d 924, 931 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.); *Rotello v. Ring Around Products, Inc.*, 614 S.W.2d 455, 463

(Tex.Civ.App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.).

Monsanto contends that the trial court properly trebled prejudgment interest as an element of Monsanto's actual damages. Under Article 21.21, Section 16 of the Texas Insurance Code, Monsanto is entitled to receive treble the amount of its actual damages because the appellants committed their deceptive acts knowingly. Monsanto contends that, because at common law prejudgment interest is recoverable as damages, it is an element of damages necessary to make the injured party whole and therefore it should be trebled under Article 21.21. Prejudgment interest has been included in actual damages and trebled in both DTPA and Insurance Code cases. *See, e.g., Celtic Life Ins. Co. v. Coats*, 831 S.W.2d 592, 598–99 (Tex.App.—Austin 1992), *rev'd on other grounds*, 885 S.W.2d 96 (1994) (DTPA); *State Farm Fire & Cas. Co. v. Gros*, 818 S.W.2d 908, 918 (Tex.App.—Austin 1991, no writ) (Insurance Code).

In *Ellis County State Bank v. Keever*, the Texas Supreme Court has recently held that prejudgment interest was not allowable on punitive damages. 888 S.W.2d 790, 798 (Tex. 1994). The trebling of prejudgment interest in the present case has the same penal effect. We have determined, however, that *Keever* does not apply to the present case. The *Keever* case concerns the Texas Civil Practice and Remedies Code, Chapter 41, which states "[t]his chapter does not apply to: (1) an action brought under the Deceptive Trade Practices—Consumer Protection Act, ... [nor] (2) an action brought under Chapter 21, Insurance Code." TEX.CIV.PRAC. & REM. CODE ANN. § 41.002(b)(1), (2) (Vernon Supp. 1994). Monsanto's suit was based upon the DTPA and the Insurance Code. Therefore, it appears that *Keever* would not specifically apply to the facts of this case.

As cited above, several Texas cases have found that prejudgment interest is an element of actual damages and therefore should be trebled under both the DTPA and Chapter 21 of the Insurance Code. We agree

with these cases and overrule this point of error.

The judgment is affirmed.